Sealed

FILED by _CP_ D.C.

JUL 3 0 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

09 - 22253

|  |  |  |
|---|---|---|
| UNITED STATES ex rel. MARC OSHEROFF, | ) ) ) | Civil Action No. _____ |
| STATE OF FLORIDA ex rel. MARC OSHEROFF, | ) ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| STATE OF GEORGIA ex rel. MARC OSHEROFF, | ) ) ) | Jury Trial Requested |
| STATE OF TEXAS ex rel. MARC OSHEROFF, | ) ) ) |  |
| STATE OF TENNESSEE ex rel. MARC OSHEROFF, | ) ) ) | CIV-KING |
| STATE OF CALIFORNIA ex rel. MARC OSHEROFF, | ) ) ) | MAGISTRATE BANDSTRA |
| Plaintiff-Relator, | ) ) |  |
| v. | ) ) ) |  |
| TENET HEALTHCARE CORPORATION; TENET HEALTHSYSTEM GB, INC. D/B/A ATLANTA MEDICAL CENTER; TENET SOUTH FULTON, INC. D/B/A SOUTH FULTON MEDICAL CENTER; TENET HIALEAH HEALTHSYSTEM, INC., D/B/A HIALEAH HOSPITAL; LIFEMARK HOSPITALS OF FLORIDA, INC., D/B/A PALMETTO GENERAL HOSPITAL; TENET HEALTHSYSTEM NORTHSHORE, INC. D/B/A NORTH SHORE MEDICAL CENTER; FMC ACQUISITION INC., D/B/A FLORIDA MEDICAL CENTER; FMC HOSPITAL, LTD. D/B/A FLORIDA MEDICAL CENTER; TENET GOOD SAMARITAN, INC. D/B/A GOOD | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |



SAMARITAN MEDICAL CENTER; TENET ST. )
MARY'S, INC. D/B/A ST. MARY'S MEDICAL )
CENTER; BROOKWOOD CENTER )
DEVELOPMENT CORPORATION; EASTERN )
PROFESSIONAL PROPERTIES , INC.; )
AMISUB (SFH) D/B/A SAINT FRANCIS )
HOSPITAL; TENET HOSPITALS LIMITED )
D/B/A DOCTORS HOSPITAL OF DALLAS; )
SAN RAMON REGIONAL MEDICAL CENTER, )
INC.; TENET HEALTHSYSTEM HOSPITALS, )
INC. D/B/A SAN RAMON REGIONAL )
MEDICAL CENTER; LOS ALAMITOS )
MEDICAL CENTER; AND JOHN DOES I )
THROUGH X, )
                                    )
       Defendants.                  )
_____)

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Marc Osheroff ("Relator"), for himself and

on behalf of the United States and the States of Florida, Georgia, Texas, Tennessee, and

California (the "States"), to recover damages and civil penalties arising from Defendants' actions

in violating the Federal and State False Claims Acts.  As set forth below, Defendants provided

remuneration to referring physicians in the form of below-market rent and related benefits in

Defendants' medical office buildings.  Such remuneration created a "financial relationship" with

such physicians pursuant to the Stark Law, prohibiting Defendants from submitting claims for

payment to Medicare and Medicaid based on referrals from such physicians.  Such remuneration

was also intended to induce or reward referrals, in violation of the Anti-Kickback Statute.  As a

result of such violations, Defendants submitted numerous false or fraudulent claims for payment

to Federal and State healthcare programs based on prohibited referrals.

Jurisdiction and Venue

2.

This action arises under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and the False Claims Act of each of the States.

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that Count I of this action arises under the laws of the United States. Supplemental jurisdiction over Counts II-VI arises under 28 U.S.C. § 1367, since those counts are so related to the federal claims that they form part of the same case or controversy.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a). At least one of the Defendants can be found, resides, or transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

The Parties and Related Entities

5.

Tenet Healthcare Corporation is a nationwide healthcare company with its headquarters located in Dallas, Texas. Through its subsidiaries, Tenet owns and operates acute care hospitals and related health care services in at least a dozen states. Tenet also owns or leases more than 70 medical office buildings (MOBs) near its various hospitals, leasing space in such buildings to physicians and other healthcare providers, who refer substantial business to Tenet's hospitals. Several of these hospitals and MOBs are located in this district.

3

6.

Tenet Healthsystem GB, Inc. d/b/a Atlanta Medical Center; Tenet South Fulton, Inc. d/b/a South Fulton Medical Center; Tenet Hialeah HealthSystem, Inc., d/b/a Hialeah Hospital; Lifemark Hospitals of Florida, Inc., d/b/a Palmetto General Hospital; Tenet HealthSystem Northshore, Inc. d/b/a North Shore Medical Center; FMC Acquisition Inc., d/b/a Florida Medical Center; FMC Hospital, Ltd. d/b/a Florida Medical Center; Tenet Good Samaritan, Inc. d/b/a Good Samaritan Medical Center; Tenet St. Mary's, Inc. d/b/a St. Mary's Medical Center; Brookwood Center Development Corporation; Eastern Professional Properties , Inc.; AMISUB (SFH) d/b/a Saint Francis Hospital; Tenet Hospitals Limited d/b/a Doctors Hospital of Dallas; San Ramon Regional Medical Center, Inc.; Tenet HealthSystem Hospitals, Inc. d/b/a San Ramon Regional Medical Center; Los Alamitos Medical Center; and John Does I through X (collectively, the "Subsidiaries") are subsidiaries of Tenet Healthcare Corporation. The Subsidiaries own and operate one or more of Tenet's hospitals. In addition, the Subsidiaries own and operate one or more MOBs adjacent to the hospitals, and lease space in such buildings to physicians and other tenants. Tenet Healthcare Corporation and the Subsidiaries are referred to collectively herein as "Tenet."

7.

Tenet derives substantial revenue from Medicare, Medicaid, and other federal or state healthcare programs, including revenue based on referrals from the physician tenants of its MOBs. According to Tenet's annual report for calendar year 2008, approximately 30.7% of its hospital admissions were Medicare patients, and 12.4% were Medicaid patients. Approximately 25.4% of Tenet's net patient revenue came from Medicare, and 8.4% from Medicaid. Total Medicare net patient revenue was approximately $2.1 billion.

4

8.

Relator Marc Osheroff is an individual resident of the State of Florida.   He is the owner and founder of Osheroff Investments, located in North Miami, in Miami-Dade County, Florida, as well as other entities specializing in the acquisition, management and leasing of commercial real estate properties, including medical office buildings.  Among other properties, one of Relator's companies owns and operates a medical office building adjacent to one of Tenet's hospitals in Hialeah, Florida.

The Stark Law

9.

42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute, and its associated regulations, 42 C.F.R. § 350 *et seq*. (collectively, the "Stark Law"), provide that, if a physician has a "financial relationship" with an entity, the physician may not make a referral to the entity for the provision of "designated health services," unless the relationship satisfies the requirements of an exception set forth in the Stark Law.

10.

The Stark Law further provides that an entity may not present or cause to be presented to Medicare a claim for designated health services furnished pursuant to a prohibited referral.  In addition, Medicare is prohibited from making payment on any such claim.

11.

The provisions of the Stark Law have been extended to Medicaid pursuant to 42 U.S.C. § 1396b(s).

5

12.

Under the Stark Law, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement."

13.

The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(A).

14.

The term "remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

15.

The Stark Law contains a number of exceptions, and if an arrangement strictly complies with the requirements of an exception, it will be deemed not to constitute a prohibited financial relationship.  Although each exception has its own specific requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided by the physician.

The Anti-Kickback Statute

16.

The Anti-Kickback Statute makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for

6

the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. 1320a-7b(b)(2).

17.

The regulations issued pursuant to the Anti-Kickback Statute set forth a number of "safe harbors," compliance with which will protect a person from application of the statute.  Although each safe harbor has its own specific requirements, most of the safe harbors require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided.

Medical Office Building Leases

18.

In terms of generating rental income, medical office buildings have traditionally been seen as among the most profitable and stable types of real estate investments.  MOBs have several advantages over other types of commercial real estate.  Among other things, physicians and other healthcare providers are generally willing to pay higher rental rates to be in a single-use professional building surrounded by other healthcare professionals and located close to a hospital.  In addition, MOBs are less susceptible to economic downturns than other office buildings, since the demand for healthcare remains relatively constant notwithstanding the state of the economy.  Thus, market rental rates for MOBs are typically not as affected by adverse market conditions as other types of commercial real estate.

7

19.

Physicians are the primary referral source for hospitals, and thus have the ability to direct substantial business to hospitals. Hospitals therefore have an incentive to provide remuneration to physicians in order to induce them to refer business to the hospital, or to reward them for past referrals. As HHS has noted, when "hospitals ...provide physicians with items or services for free or less than fair market value ... an inference arises that the remuneration may be in exchange for generating business." 70 Fed. Reg. 4858, 4866.

20.

When a hospital owns a medical office building, it has the ability to provide remuneration to physicians in the form of below-market rental rates or other lease benefits. "[W]here an entity leases space to a physician at a rental price that is substantially below fair market value, it may raise the inference that the below market rent was in exchange for future referrals, including referrals made beyond the expiration of the lease." 72 Fed. Reg. 38122, 38183.

21.

MOB leases typically describe the base rent as an amount per "rentable square foot" per year (e.g., $25 psf). The lease will typically state the number of rentable square feet in the premises (e.g., 2,000 sf). In determining "rentable square feet," the relevant industry standards require that the lease include not merely the square feet in the tenant's office space, but also a proportionate share of certain common areas, such as hallways, bathrooms, and lobbies. One way to disguise a below-market rate is to understate the number of rentable square feet in the lease documents, either by mismeasuring the office space or by failing to include a proportionate share of common areas, or both. For example, the lease may state that the rental rate is $25 psf for 2,000 square feet of rentable space, for a total rent of $50,000. If, however, the true

8

measurement is in fact 2,200 rentable square feet, the actual rental rate would be $22.73. Thus, by misstating the number of rentable square feet, the hospital has made it appear that the rental rate is higher than it actually is, which helps to disguise the below-market nature of the lease.

22.

Another way of disguising remuneration is by failing to charge tenants for costs or expenses associated with the tenant's use of the office space, or associated with the building as a whole. Space in medical office buildings may be rented either on a "full-service gross" ("FSG") basis or on a "net" basis. Under an FSG lease, the landlord is responsible for such items as utilities, real estate taxes, and common area maintenance. Under a net lease, the tenants are responsible for some or all of these items (depending on whether the lease is "triple net," "double net," or some other type), in addition to base rent  In MOBs, it is not uncommon for these additional expenses to amount to ten dollars a square foot or more.

23.

Even under a full-service gross lease, however, the tenant is generally responsible for utilities, taxes, and other operating expenses to the extent that they exceed a baseline amount. For example, an FSG lease typically provides that, if operating expenses for the building exceed the amount incurred in a base year (often the first year of the lease), the tenant will be responsible for its proportionate share of such increase. This amount, which is generally payable at the end of a lease year, can be several dollars a square foot. One way of disguising below-market rates is to fail to properly calculate the increase in operating expenses, or to charge tenants their full proportionate share of this increased amount.

24.

Another way of disguising remuneration to the tenant is through the use of extravagant tenant improvement allowances. Because of the special needs of medical office space, it is not

9

unusual for landlords to offer prospective tenants allowances to build-out the rented space to suit the tenants' needs.  Although the use of such tenant improvement allowances is not unusual, hospitals may use overly generous or unnecessary allowances as ways of providing remuneration to physicians to induce or reward referrals.

<u>Tenet's Below-Market Rentals to Referral Sources</u>

25.

Through its subsidiaries, Tenet owns or leases more than 70 medical office buildings near its various hospitals, leasing space in such buildings to physicians and other healthcare providers.

26.

In or around 2008, Tenet decided to sell 34 of its MOBs in seven states – Florida, Georgia, Alabama, Tennessee, North Carolina, Texas, and California.  Subsequently, three of the properties were disposed of separately, and the portfolio was reduced to 31 properties.  Tenet arranged with Jones Lang Lasalle (JLL), a global real estate management and consulting firm, to market the MOB portfolio to prospective purchasers.

27.

Tenet initially sought to sell the entire portfolio as a single package, and limited its disclosures to entities deemed qualified to make such a purchase.  Relator's company was one of the qualified prospective purchasers initially approved by JLL.  In order to allow Relator to evaluate the offer, JLL provided Relator with an Offering Memorandum and other supplemental documents describing the portfolio.  In addition, JLL provided Relator with detailed rent rolls, copies of leases, and other documents providing information about Tenet's leases with the MOB tenants.

28.

In reviewing the documents provided by JLL, and based upon his own experience in the real estate business and his personal dealings with Tenet, it became apparent to Relator that Tenet was providing below-market rental rates to its physician tenants.

29.

This fact was most obvious with respect to one of Tenet's medical office buildings in Hialeah, Florida, known as Palmetto Medical Plaza, on the campus of Tenet's Palmetto General Hospital. In January 2008, Relator's company had purchased another medical office building on the same hospital campus – indeed, Relator's building and Tenet's building share common entrances and are otherwise substantially similar. However, despite their similarities, the rental rates at Tenet's building were more than $10 psf cheaper than at Relator's building. The only difference between the two buildings is that Relator and the prior owner of his building do not own a hospital, and thus do not have an incentive to provide remuneration to referring physicians to induce or reward referrals.

30.

As discussed above, one of the ways a landlord can disguise a below-market rate is by understating the number of rentable square feet in the leased premises, either by mismeasuring the office space or failing to include the tenant's proportionate share of common areas, or both. In preparing the portfolio for sale, Tenet remeasured the office space in the various buildings, and JLL provided such information to Relator and other prospective purchasers along with the Offering Memorandum. A review of this information shows that, in nearly every case, the lease documents for the various properties significantly understate that actual amount of rentable square footage.

31.

For example, in Tenet's 777 E. 25th Street property in Hialeah, Florida, all but one of the offices were understated in the current lease documents, often by 20% or more. In the Palmetto Medical Plaza building, all but one of the offices were understated. In the 1190 NW 95th St. property in Miami, all but three of the leases were understated. In the Memphis, Tennessee property, all but one of the properties were understated. In the 1136 Cleveland building in Atlanta, all of the properties were understated.

32.

The fact that Tenet's leases consistently understate the tenant's actual rentable square footage is significant, because it means that the actual rental rate per square foot is substantially less than the rate stated in the lease.

33.

In its Offering Memorandum, Tenet highlighted the remeasured numbers as a selling point to highlight the potential upside in rental income. Tenet notes in the Offering Memorandum that, when leases expire, any renewals or new leases can be based on the actual remeasured square footage, rather than the amount stated in the current lease documents. Tenet tells prospective purchasers that, "For all in-place leases as of May 1, 2008, rental income, operating expenses and real estate taxes are based on current contractual RSF and related terms as defined in the lease until expiration. Upon expiration, all leasing assumptions, including rental income, operating expenses and real estate taxes are based on current, re-measured RSF." In essence, Tenet is telling prospective purchasers that they can increase rental income by using accurate RSF numbers, rather than the lower numbers in Tenet's current leases.

12

34.

In a supplement to the Offering Memorandum, Tenet identifies what it believes to be the market rate for each of the office buildings it has offered for sale. Tenet identifies several "comparable" buildings in each market area, in an effort to identify a "range" of market rates for the area. For example, for its two Atlanta Medical Center buildings in Atlanta, Tenet claims that the market rate ranges from $22 to $26 psf. In support of this assertion, Tenet identifies six "rent comparables," with rental rates ranging from $22 to $29 psf.

35.

Relator has analyzed the actual rental rates for the various office leases in the portfolio (based on Tenet's remeasured RSF figures), and compared those rates to the <u>low</u> end of what Tenet asserts is the range of market rates. Thus, for example, for the Atlanta Medical Center properties, Relator compares Tenet's actual rates to the $22 psf figure Tenet states represents the low end of the market range. This analysis shows that the vast majority of Tenet's leases are significantly below even the <u>lowest</u> end of Tenet's purported market range:

| | |
|---|---|
| 285 & 315 Medical Office Buildings, Atlanta | 45 of 46 leases less than $22 |
| 1136 Cleveland Medical Arts Center, Atlanta | 29 of 30 leases less than $16.50 |
| Hialeah Medical Office Building., Hialeah | 43 of 43 leases less than $20 |
| Palmetto Medical Plaza., Hialeah | 37 of 48 leases less than $20 |
| Medical Arts Building, Miami | 28 of 29 leases less than $20 |
| Ft. Lauderdale (4 properties) | 45 of 47 leases less than $21 |
| Farris Building, W. Palm Beach | 42 of 42 leases less than $20 |
| Birmingham (4 properties) | 73 of 77 leases less than $20 |
| Loewenberg Building, Memphis | 58 of 59 leases less than $21 |
| Doctors Professional Bldgs. I & II, Dallas | 13 of 34 leases less than $16 |
| El Paso (3 properties) | 36 of 41 leases less than $16 |
| W. Covina, CA | 18 of 21 leases less than $23 |
| Carden Grove, CA | 23 of 27 leases less than $23 |
| San Ramon, CA | 4 of 4 leases less than $27 |

36.

In many instances, the properties at the lower end of Tenet's "comparables" are not, in fact, comparable to Tenet's MOBs, and thus should not be included in an evaluation of market rates. As Relator's analysis clearly indicates, however, even if one accepts Tenet's estimation of the "range" of market rates, the vast majority of Tenet's offices are leased at rates well below that range.

37.

Indeed, in selling prospective purchasers on the value of the portfolio, Tenet appears to acknowledge that its current rental rates do not reflect market value, telling purchasers that leases may be brought to market rates at the conclusion of the leases. However, Tenet requires that, for the first two years after the sale of the portfolio, rents for current tenants cannot be increased more than CPI or 3%, even if a lease expires during that period and the market rate is higher. As Tenet states in the Offering Memorandum:

> **Rent Escalation for Renewals (In-Place Leases)**
> Tenet will require all rent increases for in-place leases be limited to the greater of 3.0% or CPI for the first 24 months after the sale of the Portfolio. As such, the cash flow projections assume all in-place leases receive an annual rent escalation of 3.0% for the first 24 months of the analysis period. If the expiration of the in-place lease occurs within the first 24 months of the analysis start date (9/1/08 to 9/1/10), the annual rent increase upon renewal is 3.0% of the previous rent for the term of the lease renewal. For all in-place leases that expire within the first 24 months of the analysis start date, a one-year renewal term is assigned to the lease.
> A market rent is applied immediately to all vacant space and Tenet leaseback space in the Portfolio. In addition, a market rent and market lease term is applied to all lease renewals that occur subsequent to the first 24 months after the analysis start date (after 9/1/10).

14

38.

Thus, not only does Tenet implicitly acknowledge that the current rental rates do not reflect market rates, but it indicates that it will contractually prohibit any purchaser from negotiating a market rate for current tenants, even after their lease expires, if that would require an increase of more than 3% of base rent.  The only possible reason for such a requirement is to ensure that current tenants continue to receive an inducement to refer business to Tenet's hospital, even after the sale of the property.  This requirement appears to constitute an admission that Tenet is subsidizing its referring physicians by providing below-market rates.

39.

In addition to the above, a review of the leases suggests that, in many cases, Tenet has provided remuneration to physicians in the form of excessively generous tenant improvement allowances.  For example, when one OB/GYN practice in Palmetto Medical Plaza moved to a new suite in the building in August 2005, Tenet provided a TI allowance of $34,810, or $24.99 psf).  This amount is equal to approximately 40% of the $87,024 rent to be paid over the entire three-year term of the lease.  In other words, Tenet agreed to pay $34,810 for tenant improvements to move the tenant to a new office, in return for a total of $87,024 in rent over a three-year period.  There appears to be little business justification for such an excessive TI allowance for a three-year lease, other than to induce or reward referrals.

40.

A review of the leases also suggests that Tenet does not give the same subsidies to tenants who are not referral sources.  For example, at the Hialeah Medical Office Building, the tenant that pays the highest rent is a gift shop – clearly not a referral source for the hospital.  The gift shop's rental rate is a dollar psf higher than the next highest tenant, $3.66 more than the third

highest tenant, and approximately $5 higher than the median rent.  The gift shop is located on the fourth floor, which is hardly a prime location.  The only explanation for this fact is that the hospital has no incentive to subsidize the gift shop, since it is not a referral source.

41.

Tenet's physician tenants are an enormous referral source to Tenet's hospitals, and Tenet has submitted, and continues to submit, numerous claims for payment to Medicare, Medicaid, and other federal healthcare programs arising out of referrals from such physicians.

42.

The remuneration described above creates "financial relationships" between Tenet and its referring physicians under the Stark Law, and Tenet does not meet the requirements of any exception under the Stark Law.  Therefore, Tenet is prohibited from submitting claims to Medicare and Medicaid for designated health services furnished pursuant to referrals from such physicians.  Accordingly, claims submitted based on such referrals constitute false claims.

43.

The payments described above violate the Anti-Kickback Statute, in that they are made for the purpose of inducing or rewarding referrals of items and services to be paid for by federal and state healthcare programs.  Accordingly, claims submitted based on such referrals constitute false claims

## COUNT I
## FEDERAL FALSE CLAIMS ACT

44.

The allegations in the preceding paragraphs are incorporated by reference.

45.

Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they:

(1)      knowingly presented or caused to be presented numerous false claims for payment or approval;

(2)      knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, or to get false or fraudulent claims paid or approved; and

(3)      conspired to commit the above acts and to defraud the Government by getting false or fraudulent claims allowed or paid.

46.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## FLORIDA FALSE CLAIMS ACT

47.

The allegations in the preceding paragraphs are incorporated by reference.

48.

Defendants violated the Florida False Claims Act, F.S.A. § 68.081 *et seq*., in that they:

(1)      knowingly presented or caused to be presented numerous false claims for payment or approval to an agency in violation of F.S.A. § 68.082(2)(a);

(2)      knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by an agency in violation of F.S.A. § 68.082(2)(b); and

(3)      conspired to submit false or fraudulent claims to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid, in violation of F.S.A. § 68.082(2)(c).

49.

As a result of Defendants' violations of the Florida False Claims Act, the State of Florida

has suffered damages in an amount to be determined at trial.

### COUNT III
### GEORGIA FALSE CLAIMS ACT

50.

The allegations in the preceding paragraphs are incorporated by reference.

51.

Defendants violated the Georgia False Claims Act, O.C.G.A. § 49-4-168 *et seq.*, in that

they:

(1)     knowingly presented or caused to be presented numerous false claims for

payment or approval to the Georgia Medicaid program;

(2)     knowingly made, used, or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by the Georgia Medicaid program; and

(3)     conspired to defraud the Georgia Medicaid program by getting false or fraudulent

claims allowed or paid.

52.

As a result of Defendants' violations of the Georgia False Claims Act, the State of

Georgia has suffered damages in an amount to be determined at trial.

### COUNT IV
### TEXAS FALSE CLAIMS ACT

53.

The allegations in the preceding paragraphs are incorporated by reference.

54.

Defendants violated the Texas Medicaid Fraud Prevention Act, Texas Hum. Res. Code, § 36.001 *et seq*., in that they knowingly or intentionally misrepresented or concealed material facts affecting their right to payment under the Medicaid program.

55.

As a result of Defendants' violations of the Texas Medicaid Fraud Prevention Act, the State of Texas has suffered damages in an amount to be determined at trial.

## COUNT V
## TENNESSEE MEDICAID FALSE CLAIMS ACT

56.

The allegations in the preceding paragraphs are incorporated by reference.

57.

Defendants violated the Tennessee Medicaid False Claims Act, Tenn. Code Ann., § 71-5-181 *et seq*., in that they:

(1)    knowingly presented or caused to be presented numerous false claims for payment or approval to the state;

(2)    knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims under the Medicaid program paid or approved by the state; and

(3)    Conspired to defraud the state by getting claims allowed or paid under the Medicaid program knowing such claims were false or fraudulent.

58.

As a result of Defendant's violations of the Tennessee Medicaid False Claims Act, the State of Tennessee has suffered damages in an amount to be determined at trial.

## COUNT VI
## CALIFORNIA FALSE CLAIMS ACT

59.

The allegations in the preceding paragraphs are incorporated by reference.

60.

Defendants violated the California False Claims Act, California Government Code §

12650 *et seq.*, in that they:

    (1)    knowingly presented or caused to be presented numerous false claims for

payment or approval to the State;

    (2)    knowingly made, used, or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by the State; and

    (3)    conspired to defraud the State by getting false or fraudulent claims allowed or

paid.

61.

As a result of Defendants' violations of the California False Claims Act, the State of

California has suffered damages in an amount to be determined at trial.


WHEREFORE, Relator, on behalf of herself, the United States, and the States of Florida,

Georgia, Texas, Tennessee, and California, prays:

    (a)    That the Court enter judgment against Defendants in an amount equal to three

times the amount of damages the United States and/or the States have sustained because of

Defendants' actions, plus a civil penalty as required or allowed by law for each violation of the

Federal and State False Claims Acts;

20

(b)     That Relator be awarded an amount that the Court decides is reasonable for

collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25

percent of the proceeds of the action or settlement of the claim if the United States and/or the

States intervene, and not less than 25 percent nor more than 30 percent of the proceeds of the

action or settlement of the claim if the United States and/or the States do not intervene;

(c)     That Relator be awarded all costs and expenses incurred, including reasonable

attorneys' fees; and

(d)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

Jonathan Kroner
Florida Bar No. 328677
420 Lincoln Rd., Suite 446
Miami Beach, FL 33139
(305) 310-6046
JK@FloridaFalseClaim.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, GA 30236
(678) 610-1994
(678) 302-8721 (fax)
mark@marksimpsonlaw.com
Attorneys for Plaintiff-Relator Marc Osheroff