IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-22253-HUCK

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* | ) | |
| MARC OSHEROFF, *et al.* | ) | Jury Trial Requested |
| | ) | |
|    Plaintiff-Relator, | ) | |
| | ) | |
|    v. | ) | |
| | ) | |
| TENET HEALTHCARE CORPORATION, *et al.* | ) | |
| | ) | |
|    Defendants. | ) | |
| _____ | ) | |

**<u>SECOND AMENDED COMPLAINT</u>**

- 1 -

When a top officer [VP Real Estate, Nicolas Bonrepos] with Dallas-based Tenet Healthcare Corp. talks about his company's relationship with its ancillary real estate, **his explanation might sound a bit confusing to someone not involved in the medical sector.**

"We don't, as a company, want to own real estate," he says. **"We want what happens because of the real estate." ...**

[Tenet officials] feared that new owners would…raise the rents to levels where doctors would complain back to the CEO. "All of those issues are real concerns for the hospital CEOs and CFOs ...," Mr. Bonrepos says. "We told them, '...**We're going to have control with a ground lease or deed restrictions.' "**

The relationship a hospital or health system has with the owner of its MOBs [medical office buildings] is so important, says Mr. Bonrepos, **that getting the highest price for the properties is not the main priority.**

"In our process of evaluating and selling these assets, we were willing to look at maybe not getting the top dollar as long as we're getting the right dollar, or the right person, to own the properties," he says.

**"We're asking the CEO to schmooze the doctors to bring them to the campus, then in the next minute we're asking the CEO to go knock on the door and collect rent,"** Mr. Bonrepos says. **"One of those things is not going to get done...It's too much to ask."**

**"Everybody talks about the Stark Laws, and by being in the real estate landlord business, there are pitfalls in which <u>Stark will come back to bite you</u>…"** [1]
[Emphasis supplied.]

---

[1]      Exhibit A, *Why Health Systems Monetize Mobs,* 2010 Healthcare Real Estate Insights (HREI) Resource Guide, p.16.
http://wolfmediausa.com/HREIRG2010/HREIRG2010reduced.pdf

**Contents**

I. Jurisdiction and Venue ................................................................................................ 5

II. The Parties and Related Entities .............................................................................. 6

    A. Plaintiffs ............................................................................................................... 6

    B. Defendants ............................................................................................................ 7

III. Regulatory Background ............................................................................................ 10

    A. Medicare and The False Claims Act ................................................................. 10

    B. The Stark Law ..................................................................................................... 10

    C. The Anti-Kickback Statute ................................................................................ 12

IV. Medical Office Building Leases ............................................................................... 13

V. Defendants' Actions ................................................................................................... 15

    A. Defendants File Claims for Payment ................................................................ 15

    B. Defendants Certify Stark and AKS Compliance ............................................. 18

        i.     Corporate Integrity Agreement (CIA) ................................................ 19

        ii.    Provider Application and Agreement ................................................... 20

        iii.   Hospital Cost Reports ............................................................................ 20

        iv.   States' Medicaid Certifications ............................................................. 22

        v.    Federal Tricare Certifications ............................................................... 22

    C. Defendants Violated the Stark Law and the AKS ........................................... 23

        i.     The Stark Violations .............................................................................. 23

        ii.    The AKS Violations ............................................................................... 24

VI. Remuneration to Physician-Tenants ...................................................................... 24

    A. Tenet's Remuneration to Physician-Tenants ................................................... 24

    B. Remuneration by Providing Office Space at No Charge ................................. 26

        i.     The Leases Provided Valuable Benefits, and were Below Market at Inception ....... 27

        ii.    Rates in 2008 Were Below Market ....................................................... 28

        iii.   Tenet Required Prospective Purchasers to Keep Rates Below Market .................... 31

    C. Benchmark Fair Market Values ........................................................................ 32

        i.     Tenet's Own Explicit Benchmark Values in "Comparable FMV" Attachment ......... 32

    ii.   Tenet's Leases' Rate per RSF State Explicit Benchmark Values ............................... 34

    iii.  The Parties' Joint Benchmark Fair Market Values .................................................... 37

    iv.  Relator's Benchmark Studies Show Leases Below Fair Market Value ................... 38

  D. Remuneration Paid to Physicians Illustrated by Non-Referring Tenants ........................... 41

    i.   Higher Rates for Non-Referrers ............................................................................. 41

    ii.   Less Mismeasurement for Non-Referrers ............................................................... 43

  E. Excessive Tenant Improvement Allowances Exceed Tenet's "Benchmark" ...................... 44

  F. Additional Benefits Provide Remuneration ....................................................................... 47

    i.   Failure to Enforce and Non-standard Terms, and Off-lease Benefits ........................ 47

    ii.   Tenet Barters Rent for Certain Physician's Services .................................................. 49

  G. Remunerative Intent Shown by Failure to Seek Market Return ........................................... 50

VII. COUNTS ................................................................................................................................. 52

  A. Count I:  Federal False Claims Act -- Presentation of False Claims ................................... 53

  B. Count II:  Federal False Claims Act -- False Statements to Get False Claims Paid ........... 53

  C. Count III:  Federal False Claims Act -- False Record Material to Obligation to Pay .......... 54

  D. Count II:  Florida False Claims Act .................................................................................. 54

  E. Count III: Georgia False Claims Act ................................................................................ 55

  F. Count IV:  Texas False Claims Act ................................................................................... 55

  G. Count V:  Tennessee Medicaid False Claims Act ............................................................. 55

  H. Count VI:  California False Claims Act ............................................................................ 56

VIII. Conclusion ......................................................................................................................... 56

IX. Exhibits ................................................................................................................................. 58

# SECOND AMENDED COMPLAINT

1.        This is a *qui tam* action by Plaintiff-Relator Marc Osheroff ("Relator"), for himself and on behalf of the United States and the States of Florida, Georgia, Texas, Tennessee, and California (the "States"), to recover damages and civil penalties arising from Defendants' actions in violating the Federal and State False Claims Acts. As set forth below, Defendants offered remuneration to physician-tenants in their medical office buildings by providing free office space, below-market rent and related benefits. Such remuneration created a "financial relationship" with such physicians in violation of the Stark Law, which prohibits Defendants from submitting claims for payment to Medicare and Medicaid based on referrals from such physicians. Such offers (and payments) were also remuneration intended to attempt to induce, or reward referrals, in violation of the Anti-Kickback Statute. As a result of such violations and claims tainted by AKS violations, Defendants submitted numerous false or fraudulent claims for payment to Federal and State healthcare programs based on these prohibited referrals.

## I. JURISDICTION AND VENUE

2.        This action arises under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., and the False Claims Acts of each of the States.

3.        Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that Count I of this action arises under the laws of the United States.

4.        Supplemental jurisdiction over Counts II-VI arises under the False Claim Act, 31 U.S.C. § 3732(b) ("Claims under state law") and also under 28 U.S.C. § 1367, since those state law counts are so related to the federal claims that they form part of the same case or controversy.

5.        Venue is proper in this district under 31 U.S.C. § 3732(a) because at least one of the Defendants can be found, resides, or transacts business within the district and many of the acts forming the basis of this action occurred within the district.

6.        As required by the Federal Civil False Claims Act, 31 U.S.C. § 3730(a)(2), Relator has served upon the Government, pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure, "a copy of the complaint and written disclosure of substantially all material evidence and

information the person [Relator] possesses." This Disclosure Statement is supported by material evidence known to the Relator at the time of its filing.

7.      Relator understands this Disclosure Statement to be confidential because it was prepared in anticipation of litigation; includes attorney-client communications and work product of Relator's counsel, including mental impressions, conclusions, opinions and legal theories concerning the anticipated litigation; and is submitted to the Attorney General and to the United States Attorney, in their capacities as potential co-counsel in the litigation and pursuant to joint prosecutorial privilege.

8.      Relator alleges that he directly, independently, and personally has observed and gained knowledge of the activities described herein and undertaken by Defendants and their agents, and this Complaint and the other information he has provided is based upon such knowledge and observations.

9.      None of the material allegations set forth in this Complaint is based on a "public disclosure" of allegations or transactions in a criminal, civil, or administrative hearing pursuant to 31 U.S.C. § 3730(3)(4)(A), in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from the news media.

## II. THE PARTIES AND RELATED ENTITIES

### A.  Plaintiffs

10.      Plaintiff, the United States of America (hereinafter "the Government"), funds the provision of medical care to senior citizens through the Medicare program and through the Medicaid program.

11.      The State Plaintiffs fund the provision of medical care through Medicaid programs.

12.      Plaintiff-Relator Marc Osheroff (hereinafter "Relator") is an individual resident of Broward County, Florida, who works in Miami-Dade and Broward counties, and has direct and personal knowledge of the allegations herein.

13.      Relator is an owner and founder of Osheroff Investments, located in North Miami, in Miami-Dade County, Florida. Osheroff Investments is a full-service real estate company specializing in the acquisition, management and leasing of commercial real estate properties, including medical office buildings. Among other properties, Relator's company owns and

operates a medical office building adjacent to Defendant Tenet's Palmetto General Hospital in Hialeah, Florida.

14.     In addition to his medical office building on Tenet's Palmetto Hospital's campus, Mr. Osheroff owns other buildings which compete with Tenet for physician tenants:

 • 16400 NW 2nd Ave, Miami,

 • 16800 NW 2 Ave., North Miami Beach, and

 • 100 NW 170th St., North Miami Beach.

15.     The North Miami Beach buildings referred to above are located on-campus at what is now known as Jackson Memorial Hospital North Campus but which was formerly a Tenet hospital, Parkway Regional.

16.     Relator is a successful entrepreneur who founded and operated successful businesses in various fields, including electronics, motorcycles, commercial real estate, medical office buildings, parking facilities, warehouses, and others.

17.     Since 1993, Relator has owned office buildings occupied by and leased to physician tenants.

18.     In January 2008, Relator's company purchased a medical office building on the Palmetto General Hospital campus. Palmetto General Hospital is owned by Defendant Tenet.

19.     Relator's building and Defendant Tenet's building share common entrances and are otherwise substantially similar. However, Relator soon learned that despite their similarities, the rental rates charged for office space in Defendant Tenet's building were more than $10 per square foot cheaper than at Relator's office building. The only difference between the two buildings is that Relator does not own a hospital and thus does not have a reason to charge lower rental rates to physician tenants to attempt to induce or reward patient hospital referrals.

### B. Defendants

20.     Tenet Healthcare Corporation (hereinafter "Defendant" or "Tenet") is a nationwide healthcare company with its headquarters located in Dallas, Texas. Through its subsidiaries, Tenet owns and operates acute care hospitals and related health care services in at least a dozen states. Tenet also owns or leases more than 70 medical office buildings (MOBs) near its various hospitals. Tenet leases space in such buildings to physicians and other healthcare providers, who

refer substantial business to Tenet's hospitals. Several of these hospitals and MOBs are located in this district.

21.     The following are subsidiaries of Tenet Healthcare Corporation: Tenet Healthsystem GB, Inc. d/b/a Atlanta Medical Center; Tenet South Fulton, Inc. d/b/a South Fulton Medical Center; Tenet Hialeah HealthSystem, Inc. d/b/a Hialeah Hospital; Lifemark Hospitals of Florida, Inc. d/b/a Palmetto General Hospital; Tenet HealthSystem Northshore, Inc. d/b/a North Shore Medical Center; FMC Acquisition Inc. d/b/a Florida Medical Center; FMC Hospital, Ltd. d/b/a Florida Medical Center; Tenet Good Samaritan, Inc. d/b/a Good Samaritan Medical Center; Tenet St. Mary's, Inc., a Tenet South Florida Corporation d/b/a St. Mary's Medical Center; Brookwood Center Development Corporation; Eastern Professional Properties, Inc.; AMISUB (SFH) d/b/a Saint Francis Hospital; Tenet Hospitals Limited, a Texas Limited Partnership d/b/a Doctors Hospital of Dallas; San Ramon Regional Medical Center, Inc.; Tenet HealthSystem Hospitals, Inc. d/b/a San Ramon Regional Medical Center; Los Alamitos Medical Center; and John Does, I through X (collectively, the "Subsidiaries"). The Subsidiaries own and operate one or more of Tenet's hospitals. In addition, the Subsidiaries own and operate one or more MOBs adjacent to the hospitals and lease space in such buildings to physicians and other tenants. Tenet Healthcare Corporation and the Subsidiaries are referred to collectively herein as "Tenet."

22.     In 1994, Tenet, then known as National Medical Enterprises, agreed to pay $379 million in criminal fines, civil damages, and penalties for kickbacks and fraud at its hospitals in more than 30 states.[2] As part of that settlement, Tenet entered into a five-year Corporate Integrity Agreement. After the settlement, the company renamed itself "Tenet."

23.     In 1999, another lawsuit for fraud was brought against Tenet, *United States of America ex rel. Sturrock v. Tenet Healthcare Corp. et al* (99-cv-00496-XR, W.D. Tex.).

24.     In 2002, Tenet was sued for offering kickbacks in violation of 42 U.S.C. § 1320a-7b. *United States ex rel. Lam v. Tenet Healthcare Corp.,* 481 F. Supp. 2d 673, 687 (W.D. Tex. 2006). the United States later sought to partially intervene. 481 F. Supp. 2d 689 (W.D. Tex. 2007).

---

[2]     The amount included $324,200,000 under the False Claims Act.

25.     In 2003, Tenet agreed to pay a $54 million fine to the federal government and to the State of California, without admitting wrongdoing, for carrying out unnecessary heart surgeries on over 600 patients at Redding Medical Center.

26.     In 2004, Tenet agreed to pay the United States $22.5 million to resolve Stark Law allegations that North Ridge Medical Center in Ft. Lauderdale, Florida, improperly billed Medicare millions of dollars for referrals by doctors with whom the hospital had prohibited financial arrangements. *United States ex rel. Barbera v Tenet Healthcare Corp.*, 97-cv-06590-AJ.

27.     In 2007, the United States brought suit in this district against Tenet's in-house counsel, Christi Sulzbach, for ignoring information that Tenet was violating the Stark Law and for falsely certifying that Tenet had adhered to its obligations under an existing Corporate Integrity Agreement.

> [T]he Defendant's conduct made a mockery of the commitments and representations that she made. Between January and July of 1997, five different Tenet employees presented her with information suggesting that a number of contracts that Tenet had with doctors in Florida might violate the Stark statute, 42 USC section 1395 NN.
>
> ...
>
> Instead of reporting Tenet's Stark violations to the government, as required by the Corporate Integrity Agreement, she submitted sworn declarations in June 1997 and June 1998 that falsely certified that Tenet was in compliance with applicable federal program requirements.

*United States v. Sulzbach* 07-cv-61329-KAM, DE-91-1, p. 2.

28.     *Sulzbach* was not resolved on the merits. Judge Marra dismissed it as barred by the Statute of Limitations. *Id.*, 07-cv-61329-KAM at DE-142.

29.     In 2006, Tenet agreed to pay the Federal Government $900 million for violations that included kickbacks to physicians. According to a Justice Department (DOJ) press release, the settlement included "claims that Tenet paid kickbacks to physicians to get Medicare patients

referred to its facilities."[3]   The DOJ press release notes that the settlement was based on the company's ability to pay. The term "ability to pay" means that a defendant was not required to repay the full amount it owed.

30.     As part of that settlement, Tenet entered into a five-year Corporate Integrity Agreement, lasting through September 2011.

31.     In April 2012, Tenet paid another $43 million for another Medicare fraud.[4]

### III.  REGULATORY BACKGROUND

#### A.  Medicare and The False Claims Act

32.     Medicare is a federally funded health insurance program primarily benefiting the elderly. 42 U.S.C. § 1395 *et seq*.

33.     Defendants derived revenue from the Medicare program by submitting medical claims for reimbursement to the U.S. government.

34.     Under the Federal False Claims Act (FCA), 31 U.S.C. §3729(a) *et seq*., any person having direct, personal knowledge about a violation of the Act may bring an action on behalf of the United States of America.

35.     A provider's failure to inform itself of the legal requirements for participation in the Medicare program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it under the FCA with knowledge of the falsity of claims submitted for reimbursement by the U.S. government.

#### B.  The Stark Law

36.     42 U.S.C. § 1395nn and its associated regulations, 42 C.F.R. § 350 *et seq*. (collectively, the "Stark Law" or "Stark"), enacted as amendments to the Social Security Act, prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient

---

[3]     *Tenet Healthcare Corporation to Pay U.S. more than $900 Million to Resolve False Claims Act Allegations*, June 29, 2006. http://www.justice.gov/opa/pr/2006/June/06_civ_406.html, last checked Dec 8, 2011

[4]     http://www.justice.gov/opa/pr/2012/April/12-civ-446.html last checked July 16, 2012.

referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.

37.     Prior to its passage, studies had shown that when physicians had financial relationships with hospitals, they referred more patients to these hospitals than they otherwise would have. 66 Fed. Reg. 856, 859 (Jan 4, 2001).

38.     The Stark Law was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

39.     The Stark Law provides that an entity may not present or cause to be presented to Medicare a claim for "designated health services" furnished pursuant to a prohibited referral.

40.     The Stark Law explicitly states that Medicare may not pay for any designated health service provided in violation of Stark. *See* 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

41.     Compliance with the Stark Law is a material condition of payment of a Medicare or Medicaid claim. *See,* 42 U.S.C. § 1395nn(g)(1) (prohibiting payment for designated health services provided in violation of the Stark Law) and 42 U.S.C. § 1396b(s) (Medicaid)..

42.     Hospital services are "designated" health services under Stark.

43.     A violation of the Stark Law gives rise to FCA liability.

44.     The provisions of the Stark Law have been extended to Medicaid pursuant to 42 U.S.C. § 1396b(s).

45.     Under Stark, a "financial relationship" consists of either an "ownership or investment interest" or a "compensation arrangement."

46.     The term "compensation arrangement" means any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

47.     The term "remuneration" includes any payment *or other benefit* made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

### C. The Anti-Kickback Statute

48.     The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payments to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality, or even harmful to a vulnerable patient population. The Anti-Kickback Statute was at least partially based on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there existed a financial incentive to generate business.

49.     To protect the integrity of the federal health care programs, and realizing the difficulty for regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, *regardless of whether the particular kickback gave rise to overutilization of hospital services* or poor quality of care.

50.     The Anti-Kickback Statute makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person (i) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (ii) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any goods, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

51.     A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. § 1320a7b(g).

52.     Congress specifically amended the Anti-Kickback Statute on March 23, 2010, to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 codified at 42 U.S.C. § 1320a-7b(g).

53.     The provisions of the AKS have been extended to Medicaid.

54.     The Florida statutes are similar to their Federal counterparts. Fla. Stat § 456.054(2) "Kickbacks prohibited"; Fla. Stat. § 409.920(e); FS § 456.053 "Financial arrangements between referring health care providers and providers of health care services…"

55.     The other states have similar statutes.

## IV. MEDICAL OFFICE BUILDING LEASES

56.     Medical office buildings (MOBs) have traditionally been seen as among the most profitable and stable types of real estate investments. MOBs have several advantages over other types of commercial real estate. Among other things, physicians and other healthcare providers are generally willing to pay higher rent to be in a single-use professional building surrounded by other healthcare professionals and located close to a hospital. In addition, MOBs are less susceptible to economic downturns than other office buildings, since the demand for healthcare remains relatively constant notwithstanding the state of the economy. Thus, market rental rates for MOBs are typically more stable and less affected by adverse market conditions than other types of commercial real estate.

57.     Physicians are the primary referral source for hospitals and thus have the ability to direct substantial business to hospitals. Hospitals, therefore, have an incentive to provide remuneration to physicians in order to attempt to induce them to refer business to the hospital or to reward them for past referrals. As HHS has noted, when "hospitals … provide physicians with items or services for free or less than fair market value… an inference arises that the remuneration may be in exchange for generating business." 70 Fed. Reg. 4858, 4866.

58.     When a hospital owns a medical office building it has the ability to provide remuneration to physicians in the form of below-market rental rates or other lease benefits. "[W]here an entity leases space to a physician at a rental price that is substantially below fair market value, it may raise the inference that the below market rent was in exchange for future referrals*, including referrals made beyond the expiration of the lease*." 72 Fed. Reg. 38122, 38183 [emphasis supplied].

59.     MOB leases typically describe the base rent as an amount per "rentable square foot" (RSF) per year. A lease will typically state the number of rentable square feet in the premises (e.g., 2,000 RSF). In determining "rentable square feet," the relevant industry standards require

- 13 -

that the lease include not merely the square feet in the tenant's office space but also a proportionate share of certain common areas, such as hallways, bathrooms, and lobbies.

60.     One way to disguise remuneration to physicians is to provide space at no charge by understating the number of rentable square feet in the lease documents, either by under-representing the office space or by failing to include a proportionate share of common areas, or both.

61.     For example, the lease may state that the rental rate is $25 per square foot (psf) for 2,000 square feet of rentable space, for a total rent of $50,000. If, however, the true measurement of the space is in fact 2,200 RSF, then the landlord is offering a $5,000 (200 x $25) per year benefit. For a five-year lease, the understatement of square footage benefits a physician-tenant by at least $25,000.

62.     Thus, by under-representing the number of rentable square feet in its lease, the hospital has covertly conferred a benefit on the physician-tenant.

63.     Another way of disguising remuneration is by failing to charge tenants for costs or expenses associated with the tenant's use of the office space, or failing to charge for costs associated with the building as a whole. Space in medical office buildings may be rented either on a "full-service gross" ("FSG") basis or on a "net" basis. Under an FSG lease, the landlord is responsible for such items as utilities, real estate taxes, and common area maintenance. Under a net lease, the tenants are responsible for some or all of these items (depending on whether the lease is "triple net," "double net," or some other type), in addition to base rent. In MOBs, it is not uncommon for these additional expenses to amount to ten dollars or more per square foot.

64.     Even under a full-service gross lease, however, the tenant is generally responsible for utilities, taxes, and other operating expenses to the extent that they exceed a baseline amount. For example, an FSG lease typically provides that, if operating expenses for the building exceed the amount incurred in a base year (often the first year of the lease), the tenant will be responsible for its proportionate share of such increase. This amount, which is generally payable at the end of a lease year, can be several dollars per square foot.

65.     One way of disguising below-market rates or remuneration to the tenant is to fail to properly calculate the increase in operating expenses or to fail to charge tenants their full proportionate share of this increased amount.

66.     Another way of disguising remuneration to the tenant is through the use of extravagant tenant improvement (TI) allowances. Because of the special needs of medical office space, it is not unusual for landlords to offer prospective tenants allowances to build-out the rented space to suit the individual tenants' needs. Although the use of such tenant improvement allowances is not unusual, hospitals may use overly generous or unnecessary allowances to provide remuneration to physicians with the intent of inducing or rewarding patient referrals.

## V. DEFENDANTS' ACTIONS

### A. Defendants File Claims for Payment

67.     All Tenet hospitals participate in the Medicare and Medicaid programs.

68.     Approximately 31% of its hospital admissions are Medicare patients and 12% are Medicaid patients. Approximately 25% of Tenet's net patient revenue came from Medicare and 8% from Medicaid. Exhibit D, 2008 Form 10-K.

69.     CMS publishes hospitals' Medicare claims data. For example, at a single hospital, Tenet's Palmetto Hospital in Hialeah Florida, CMS reports Medicare claims for calendar year 2010 exceeding $ 232,705,382. [5]

70.     Tenet's total 2008 Medicare net revenue was approximately $2.15 billion. Exhibit D.[6]

71.     Exhibit F shows a sample of detailed claim data regarding referrals from physician-tenants to various Defendants.

72.     Exhibit F identifies for each claim the referring provider and his Medicaid number, the billing providers (Tenet entities) and their Medicaid numbers, the date of service, the amount of the claim, the amount Medicaid paid and the patient's name (redacted for patient confidentiality).

73.     For example, exhibit F at pp 1 – 5 shows 245 Medicaid referrals from Angel F. Vidal, M.D. to Defendants Tenet Hialeah Health Systems, Inc. and Lifemark Hospital of Florida Inc.

74.     Angel F. Vidal, M.D., P.A. has been a tenant in Suite 704 at Tenet's Palmetto Hospital Medical office building, 7100 W. 20th Ave., Hialeah, Florida, since June 1, 2003 through the present.

---

[5]     http://www.ahd.com/free_profile/100187/Palmetto_General_Hospital/Hialeah/Florida/

[6]     An additional 13.5% revenue is "Managed care – governmental" resulting in 47.3% governmental revenue.

75.     Each of the following physician-tenants were also "referring providers" for claims detailed in Exhibit F.

| Referring Physician / Suite # | Referred Medicaid Claims | Referred Claims Amount | Amount paid by Medicaid | Board Certification |
|---|---|---|---|---|
| Vidal - 704 | 245 | $ 857,448 | $ 16,635 | internal medicine and rheumatology |
| Alvarez - 803 | 169 | 1,413,613 | 18,434 | n/a |
| Font - 806 | 377 | 4,461,543 | 139,061 | surgery and thoracic surgery |
| Pagan - G176 | 20 | 125,911 | 2,465 | neurological surgery |
| Magcalas - 504 | 107 | 398,680 | 10,261 | pulmonary disease and critical care |
| Corin - 512 | 148 | 650,005 | 22,196 | neurology |
| Ason - G154 | 340 | 7,187,261 | 84,430 | cardiovascular disease and internal medicine |
| Urquiza - 314 | 464 | 7,542,823 | 96,693 | n/a |
| Halperin - 213 | 140 | 4,287,801 | 106,316 | internal medicine |
| Fields - 311 | 37 | 71,725 | 1,501 | internal medicine |
| Pazos - G166 | 178 | 2,529,512 | 67,111 | cardiovascular disease |
| Total | 2,225 | | | |

76.     Exhibit B shows that at the lease inception each of these tenants received free space. The space given by Defendant to its tenants without charge is valuable remuneration. Exhibit Z.

| Physician | Suite # | Exhibit B | Free Space |
|---|---|---|---|
| Vidal | 704 | 93% | 7% |
| Alvarez | 803 | 93% | 7% |
| Font | 806 | 94% | 6% |
| Pagan | G176 | 101% | |
| Magcalas | 504 | 92% | 8% |
| Corin | 512 | 91% | 9% |
| Ason | G154 | 71% | 29% |
| Urquiza | 314 | 93% | 7% |
| Halperin | 213 | 88% | 12% |
| Fields | 311 | 63% | 27% |
| Pazos [7] | G166 | 95% | 5% |

---

[7]     Plus one year's rent, $62,325, as an "improvement allowance." See paragraph 259.

- 16 -

77.     All but one of these physicians, who were also referring physicians, were charged for fewer than the actual number of square feet in their rental space. Thus, they received a benefit of free office space and this benefit is remuneration.

78.     For example, Defendants gave Dr. Pazos 158 feet at no charge. Assuming the face value of his 2006 lease at $20.50 per RSF (as Defendants state in the lease is FMV), then as of the signing of the lease the remuneration was a benefit of $3,239 per year, or $16,195 total for the five-year lease. However, if the rate was $26 (Exhibit B1) rather than $20.50, then the benefit was $20,540 (158 feet times $26 = $4,108 per year, for 5 years).

79.     But even Dr. Pagan, who did not receive a benefit in the form of free space, benefitted from an excessive TI allowance awarded at the start of that lease. Dr. Pagan leased a ground-floor suite, 176G, effective April 1, 2003, for three years at $15 per RSF for 2,053 square feet for a total of $30,795 per year. Exhibit Q hereto. But the lease gave back a $32,000 "improvement allowance," an amount exceeding the first year of his three years lease. *Id.*

80.     The 2,225 Medicaid claims referred by the 11 physicians in Exhibit F are a subset of the total referrals. It is reasonable to assume that the physician-tenants treated a greater number of Medicare referrals since the elderly typically have more medical issues than the young. This is especially obvious with cardiologists such as ground floor tenants Drs. Ason and Pazos.

81.     Texas *Medicaid* claim samples and summaries show claims totaling $57,631,457, based on tens of thousands of claims from 2000 through early 2010, paid to seven Tenet hospitals *based on referrals from physicians in addresses in its medical office buildings*. For each of Tenet's seven Texas hospitals affiliated with an office building identified in Exhibit B, the Exhibit at P1 hereto[8] shows *sample* claims including:

- 10 referring tenant-physicians for each of Tenet's Texas hospitals, pp. 1-3.
- 10 claims per hospital, pp. 4-6.
- Annual referral totals from physicians in addresses in its medical office buildings, p. 7

82.     Nearly 900 physicians with addresses in Tenet's medical office buildings have referred patients to Tenet's Texas hospitals. Exhibit P2 hereto, 18 pp.

---

[8]     The exhibits P1 and P2 are for purposes of "reliability" that claims were filed. Relator does not allege that Tenet paid remuneration to all of these physicians.

83.    A *sample* of California data for one hospital (Garden Grove, CA, not that hospital's entire Medicaid claim set) shows Defendants filed claims for $28,943,507 (Medicaid only) for dates of service after April 1, 2004. Exhibit M hereto.

84.    Exhibit M shows a sample of Medicaid referrals from a single building, 12555 Garden Grove Blvd, Garden Grove, CA, to Tenet's Garden Grove Hospital (since sold) from 04/01/2004 – 4/10/2010. The data shows, for example, a sample of the many claims referred by physician-tenants who enjoyed the benefits of free space (see Exhibits B1 – B5, and Exhibit Z). For example:

| Referring Provider | suite # | billed | lines[9] |
|---|---|---|---|
| Andrew H. Ahn, MD, | 403 | $ 234,451 | 243 |
| Jae H. Kim MD, | 407 | $ 707,104 | 586 |
| Francis S. Lee,  MD, | 303 | $ 817,445 | 373 |
| Brian S. Rhee, MD, | 408 | $   72,949 | 190 |
| Peter K. Wang, MD Inc., | 306 | $ 290,664 | 247 |

85.    FCA liability does not depend on whether or not a claim was paid.

86.    The federal government pays for a percentage of the States' Medicaid. 42 U.S.C. §§ 1396b(a)(1), 1396d(b). For example, the CMS share of Medicaid outlays totaled $275 billion in Fiscal Year 2010.

87.    Exhibit B2 shows that all of the referring physicians listed above are also tenants either directly, or through their professional associations (P. A.s), in Defendants' hospitals.

**B.  Defendants Certify Stark and AKS Compliance**

88.    Defendants expressly certified compliance with the provisions of the AKS, Stark Law, and other applicable laws, regulations, and provider instructions when they signed provider applications, cost reports, and corporate integrity agreements (CIAs) and submitted them to the U.S. government.

89.    These documents that contain certifications of compliance were submitted to the government as a condition to receiving Medicare and Medicaid reimbursements.

---

[9]   Each "line" is a procedure, but more than one procedure may be bundled into a "claim" so there are fewer "claims" than "lines."

90.     Defendants filed a small sample of these certifications with the Court at D.E. 87-1, 87-2, 87-4, 87-5, 87-7, 93-1 and 93-2.

91.     These certifications were false because Defendants violated the Stark and Anti-Kickback Statutes through the fraudulent schemes described below.

92.     Consequently, Defendants made false statements to obtain payments from the Government and accepted payment from the Government for the false claims.

### i.     *Corporate Integrity Agreement (CIA)*

93.     Defendants have entered at least twice into Corporate Integrity Agreements (CIAs) with the U.S. government because of significant misconduct and violations of the Medicare and Medicaid laws. See paragraphs 22 and 30.

94.     Defendants were reminded of the legal significance of certification in 2007 when the United States brought suit against Tenet's in-house counsel for falsely certifying compliance with the first Corporate Integrity Agreement. *United States v. Sulzbach* 07-cv-61329-KAM, S.D. Fla.

95.     A primary purpose of Defendants' Corporate Integrity Agreements was to ensure that "each existing or new or renewed Arrangement does not violate the Anti-Kickback Statute . . ." Exhibit R, CIA at p. 11.

96.     Defendants' CIA obligations included the requirement that it submit specific reports on their leases (focus arrangements) so that the terms of the leases were disclosed and open to review. Exhibit R, CIA, Appendix D, p. 60 (pdf p. 27), Focus Arrangements Reviews. Many of these leases are under scrutiny in the case before this Court. [10]

97.     Defendants' executives had knowledge of the CIAs and were instructed to comply with their certification requirements.

98.     Hundreds of Tenet's leases include these express certifications of compliance with the Anti-Kickback Statute and the Stark Law.

---

[10]     Tenet was charged with providing the IRO with 40 focus arrangements at each Tenet hospital. *Id.* para. 2, CIA p. 60. Tenet was to provide information that would allow the IRO to verify leased space and remuneration, *id.* 2(c) and 2(e), and "that corrective action is being implemented when violations of the Anti-Kickback Statute and Stark law are discovered." *Id.* at 2(g). The IRO was to prepare a Focus Arrangements Review Report with recommendations "to ensure that the arrangements at Tenet hospitals do not violate the Anti-Kickback Statute and Stark Law." *Id.* at paragraph 4. Exhibit R hereto.

### ii.    *Provider Application and Agreement*

99.    To be enrolled in the Medicare program, providers must submit and sign enrollment applications. A provider's signature attests that the provider is aware of and will abide by all applicable statutes, regulations, and program instructions.

100.    The certification language has specifically mentioned the Anti-Kickback and Stark Law since 2001.

> Section 15: CERTIFICATION STATEMENT
> A. Additional Requirements for Medicare Enrollment
> . . .
> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (**including, but not limited to, the Federal anti-kickback statute and the Stark law**), and on the provider's compliance with all applicable conditions of participation in Medicare.
> . . .6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Medicare Enrollment Application, Institutional Providers, CMS – 855A. [Emphasis supplied

101.    The specific reference to "the Federal anti-kickback statute and the Stark law" makes clear that Medicare program will not pay claims if the underlying transaction that gave rise to the claim violated these statutes.

102.    By virtue of Defendants' execution of Provider Applications, Defendants knew or should have known of the requirements of the AKS and Stark Law and the need to conform to these statutory requirements.

103.    Defendants executed Provider Applications for all of their hospitals. *See* samples at DE 87-5, 93-1 and 93-2, Certification Statements executed by Douglas E. Rabe, VP & Asst. Treasurer; Craig C. Armin, Vice President; John F. Bealle, Vice President; and by Diane Lowder, President & CEO.

### iii.    *Hospital Cost Reports*

104.    As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final

claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

105.    Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

106.    Defendants' hospitals were, at all relevant times, required to submit cost reports. The first paragraph of Defendants' cost report specifically certifies:

> Furthermore, if services identified by this report were provided or procured through the **payment directly or indirectly of a kickback or where otherwise illegal**, criminal, civil and administrative action, fines and/or imprisonment may result.

Notice, Exhibit 1, Doc 87-1. [emphasis supplied], Hospital and Hospital Health Care Complex Cost Report in Lieu of Form CMS-2552-96, Craig C. Armin, Vice President, 5/27/2009.

107.    Annual cost report certifications have been required for reimbursement at all times relevant to this Complaint.

108.    Correct cost reports are a material condition of payment by the government to the provider.

109.    Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

110.    At all times relevant to this complaint, the cost report certification page included the following notice:

> MISREPRESENTATION OR FALSIFICATION … MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IM-PRISONMENT …. FURTHERMORE, IF SERVICES IDENTIFIED BY THIS REPORT WERE PROVIDED OR PROCURED **THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WHERE OTHER-WISE ILLEGAL**, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.
> [All caps in original, bold emphasis supplied].

111.    At all times relevant to this complaint, the responsible provider official was required to certify, in pertinent part, as follows:

> I hereby certify that I have read the above statement [paragraph 111 above] and that I have examined the accompanying electronically filed or manually submitted cost report . . . and that to the best of my knowledge and belief, it [the cost report]

is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

112.     Thus, the provider was required to certify that the filed cost report is (1) truthful, (2) correct, (3) complete, (4) that the services provided in the cost report were not linked to kickbacks, and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the Anti-Kickback Statute.

113.     Defendants' hospitals submitted cost reports at all times material to this complaint and attested to the certification above.

### iv.     States' Medicaid Certifications

114.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. Each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2), (5). The various states' Medicaid programs use Medicare cost reports in connection with Medicaid reimbursement.

115.     Defendants derived revenue from the Medicaid program.

116.     Defendants' hospitals submitted claims to Medicaid that were based on their *Medicare cost reports*. Whenever the Medicare cost reports of Defendants' hospitals contained false certifications or incorrect data or information, the claims to Medicaid were also false.

### v.     Federal Tricare Certifications

117.     TRICARE is a federally funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).

118.     Defendants derived revenue from the TRICARE program.

119.    In addition to individual patient costs, TRICARE reimburses hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

120.    A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") which requires that the provider certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

121.    Defendants' hospitals submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports contained false certifications, those Requests for Reimbursement were also false.

### C.  Defendants Violated the Stark Law and the AKS

#### i.    The Stark Violations

122.    The leases described in this Complaint create "financial relationships" between Tenet and its physician-tenants under the Stark Law and similar state laws. 42 U.S.C. § 1395nn and 42 C.F.R. § 350 *et seq*.

123.    With respect to these physician-tenants, Tenet is prohibited from submitting claims to Medicare and Medicaid for designated health services furnished pursuant to referrals from such physicians.

124.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), the claims described above were false and/or fraudulent because Defendants were prohibited by the Stark Law from obtaining payment from the United States based on claims they submitted for designated health services provided to patients who had been referred by physicians with whom Defendants had prohibited financial relationships.

125.    Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by making false statements, or causing false statements to be made by the fiscal intermediary, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom they had prohibited financial relationships.

126.    Defendants' certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or

fraudulent because the Stark Law prohibited Defendants from receiving payments from the United States for those claims.

127.    Defendants knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States (i.e., to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7).  The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and Medicaid.

128.    Accordingly, claims submitted based on such physician-tenant referrals constitute false claims.

### ii.    The AKS Violations

129.    The offers and payment of remuneration and benefits described below also violate the Anti-Kickback Statute in that they were made for the purpose of inducing or rewarding referrals of items and services to be paid for by Federal and State healthcare programs.

130.    Accordingly, claims submitted to the U.S. government based on referrals tainted by offers of remuneration intended as attempted inducements constitute false claims.

### VI. REMUNERATION TO PHYSICIAN-TENANTS

#### A. Tenet's Remuneration to Physician-Tenants

131.    Through its subsidiaries, Tenet owned or leased more than 70 medical office buildings, providing approximately 2.24 million square feet of rental space near its various hospitals. They lease space in such buildings to physicians and other healthcare providers.

132.    In approximately 2008, Tenet decided to sell 34 of its MOBs in seven states – Florida, Georgia, Alabama, Tennessee, North Carolina, Texas, and California. Subsequently, some of the properties were disposed of separately and the portfolio was reduced. Tenet arranged with Jones Lang Lasalle (JLL), a real estate management and consulting firm, to market the MOB portfolio to prospective purchasers. *See* Exhibits G, H and I.

133.     Tenet initially sought to sell the entire portfolio as a single package and limited its disclosures to entities deemed qualified to make such a purchase. Relator's company was one of the qualified prospective purchasers initially approved by JLL. In order to allow Relator to evaluate the offer, JLL provided Relator with an Offering Memorandum and other supplemental documents describing the portfolio. In addition, JLL provided Relator with thousands of supporting documents, including detailed rent rolls, copies of leases, financial statements (e.g. Exhibit J) and other documents providing information about the buildings and Tenet's leases with over 600 MOB tenants.

134.     In reviewing the documents provided by JLL, and based upon his own experience in the real estate business and his personal dealings with Tenet, it became apparent to Relator that Tenet was providing remuneration to its physician-tenants.

135.     This fact was most obvious for one of Tenet's medical office buildings in Hialeah, Florida, known as Palmetto Medical Plaza, on the campus of Tenet's Palmetto General Hospital. In January 2008, Relator's company had purchased another medical office building on the same hospital campus – indeed, Relator's building and Tenet's building shared common entrances and were otherwise substantially similar. However, despite their similarities, the rental rates at Tenet's building were more than $10 psf cheaper than at Relator's building.

136.     The only material difference between the two buildings was that Relator did not own a hospital and thus did not have an incentive to provide remuneration for referring physician-tenants to attempt to induce or reward referrals.

137.     For example, most of Tenet's 2006 and 2007 rents at the Palmetto Medical Office, 7100 W. 20th Ave., Hialeah, were in the range of $18 to $20 RSF (Exhibit B1), and even lower elsewhere in South Florida (Exhibit B1). Referring physicians (Exhibit F) Drs. Ason, Pagan and Pazos were charged at $10.33, $20.23 and 20.29 per square foot respectively. These physicians all enjoy ground floor suites, to wit, G-154, G-176 and G-166 respectively.[11] Exhibit B2.

138.     However, Relator was charging and receiving rents of over $30 RSF at his adjacent buildings on 7150-7160 W. 20th Ave. Exhibit K.

_____

[11]     The leases are in the names of Rafael Ason, M.D., PA, Luis R. Pagan, M.D., P.A. and Victor Pazos, M.D., P.A.

139.     Indeed, Tenet renewed a lease and agreed to pay Relator's company $36 RSF (modified net, equivalent to $40 FSG) in April 2008, Exhibit K, p. 5, for a space just down the hall from where Tenet charged its referring physicians $18 to $20 RSF.

140.     In 2009, a large ground floor office leased by Relator to Tenet in Relator's Palmetto Hospital based building (7160 W. 20th Ave.) was appraised by Relator's appraiser at $40 RSF, by Tenet's appraiser at $35, and at $38 by a third appraiser (chosen by the other appraisers to settle their disagreement). Exhibit K, pp. 3 and 9.

141.     As alleged below, Tenet paid remuneration to physicians of $9-$10 psf by charging on average $9 to $10 psf less than average medical office buildings in South Florida. Exhibit B1.

### B. Remuneration by Providing Office Space at No Charge

142.     As discussed above, one of the ways a hospital can provide valuable remuneration to physicians is to provide office space at no charge by understating the number of rentable square feet in the leased premises, either by misrepresenting the footage of office space, by failing to include the tenant's proportionate share of common areas, or both.

143.     In preparing the portfolio for sale, Tenet re-measured the office space in the various buildings to industry standard "Standard Method for Measuring Floor Area in Office Buildings" published by the Building Owners and Managers Association (BOMA).

144.     JLL provided such information to Relator and to other prospective purchasers along with the Offering Memorandum. A review of this information shows that the lease documents for hundreds of offices in various properties significantly understated the actual amount of industry standard BOMA rentable square footage (RSF). [12]

145.     Tenet's sales material explains how it re-measured rentable square feet (RSF):

> Rentable Square Feet
> For all in-place leases as of May 1, 2008, rental income, operating expenses and real estate taxes are based on **current contractual RSF** and related terms as defined in the lease until expiration. Upon expiration, all leasing assumptions, including rental income, operating expenses and real estate taxes are based on current, re-measured RSF.

---

[12]     Although widely referred to as "The BOMA Standard" it is also an American National Standards Institute (ANSI) approved standard, and carries the designation "ANSI Z65.1," or "BOMA/ANSI Z65.1-1996" designating the 1996 version in place through all relevant times to this Complaint. Exhibit T, Affidavit of Stephen Page.

(Emphasis supplied). Exhibit C, Excerpt from Offering Memorandum, pdf p. 9.

146.     For the sale, RSF was "re-measured" using BOMA standards and methodology.

147.     Although BOMA methods are occasionally revised, the BOMA interior standards did not change between 1996 and 2010. Exhibit T. para. 7.

148.     Per the express terms of the leases, nearly all leases shown in Exhibit B2 claim they were originally measured using BOMA standards.

149.     For example, Exhibit U shows BOMA used in excerpts from leases dated 2005 (Dr. Fields), 2006 (Dr. Pazos) and 2002 (Dr. Pagan).

150.     For nearly all tenants, the leases understated the actual number of rentable square feet. Exhibit B2.

151.     Stephen Page, an expert in BOMA who has measured and been involved with the re-measurement of thousands of large office buildings, including large medical office buildings, states in his affidavit:

> 11.     I have reviewed the detailed exhibit showing the RSF re-measurement in Tenet's office buildings. There is no good faith reason to account for RSF understatement in this portfolio. My colleagues' reaction to the question was the same as my own:  There is no good faith reason to account for consistent RSF understatement in a portfolio of buildings.
> 12.     This is especially true given the geographic dispersion of these buildings and the many years over which the leases were entered into. Mistakes in measurement in one building complex in one rental period may happen but given the industry-wide use of a consistent BOMA standard, the likelihood of mistakes of measurement in many buildings in several states over the course of many leasing periods is so unusual as to suggest a conscious decision by Tenet to understate RSF. The understatement cannot have been accidental. The only possible explanation for an across-the-board understatement of office space in as many buildings as shown in the Tenet portfolio is an intentional RSF reduction in order to reduce rent while maintaining the appearance of market value rates per RSF.
> Exhibit T.

### i.     The Leases Provided Valuable Benefits, and were Below Market at Inception

152.     In nearly all cases, the leases provided valuable benefits to the physician-tenants and were below market when they were entered into.

153.     For example, in Tenet's 777 E. 25th Street property in Hialeah, Florida, all but one office measurement was understated in current lease documents-- often by 20% or more. In the

Palmetto Medical Plaza building, all but one of the office measurements were understated. In the 1190 NW 95th St. property in Miami, all but three of the leases showed understated measurements. In the Memphis, Tennessee property, all but one of the leases showed understated measurements. In the 1136 Cleveland building in Atlanta, all of the leases showed understated measurements.  Exhibit B.

154.    That Tenet's leases consistently understated physician-tenants' actual rentable square footage is significant because it means that they provided free space to physicians, or to put it another way, that actual rental rate per square foot calculated on all RSF (as remeasured) is less than the rate stated in the lease. Exhibit T, Affidavit of Stephen Page.

155.    As stated by Mr. Page, "The only possible explanation for an across-the-board understatement of office space in as many buildings as shown in the Tenet portfolio is an intentional RSF reduction in order to reduce rent while maintaining the appearance of market value rates per RSF." Exhibit T, Affidavit of Stephen Page, paragraph 12.

156.    Tenet understood the financial significance of measuring office space accurately to maximize profit. In its Offering Memorandum, Tenet highlighted the re-measured numbers as a selling point to highlight the potential up-side in rental income. The Offering Memorandum stated that when leases expire, any renewals or new leases can be based on the actual re-measured square footage rather than the amount stated in the current lease documents. Tenet tells prospective purchasers that, "For all in-place leases as of May 1, 2008, rental income, operating expenses and real estate taxes are based on current contractual RSF and related terms as defined in the lease until expiration. Upon expiration, all leasing assumptions, including rental income, operating expenses and real estate taxes are based on *current, re-measured RSF.*" [Emphasis supplied.] In essence, Tenet is telling prospective purchasers they can increase rental income by charging for accurate RSF numbers rather than giving away space as Tenet had done in Tenet's leases.

## ii.    *Rates in 2008 Were Below Market*

157.    Rents collected by commercial landlords from their commercial leases tend to remain at fair market value since base rent is subject to annual cost-of-living increase adjustments and since commercial buildings' maintenance, taxes, insurance, and other costs are typically passed through to the tenants who absorb a pro-rata share of actual costs.

158.     Tenet's leases, on their face, appeared to be typical commercial leases. They mandate annual cost-of-living increases and many have a pass-through of cost increases.

159.     However, since Tenet did not actually charge market rates from the leases' inception, and did not comply with the terms of many of their leases, the result is that, unlike most commercial leases, its leases fell below market value across-the-board.

160.     Tenet acknowledges that the leases fall below market value, see paragraph, but does not quantify the full extent to which they are below market value.

161.     In a supplement to the Offering Memorandum, Tenet identifies what it believes to be the then market rate for each of the office buildings it has offered for sale. Tenet identifies several "comparable" buildings in each market area, in an effort to identify a "range" of market rates for the area. For example, for its two Atlanta Medical Center buildings in Atlanta, Tenet claims that the market rate ranges were from $22 to $26 psf. To support this assertion, Tenet identifies six "rent comparables," with rental rates ranging from $22 to $29 psf.

162.     Relator has analyzed the actual rental rates at the time of the sale for the various office leases in the portfolio (based on Tenet's re-measured RSF figures), and compared those rates to what Tenet asserts is the range of market rates.[13] Exhibit B2. A majority of Tenet's leases were well below the lowest market value.

163.     For example, for the Atlanta Medical Center properties, Relator compares Tenet's actual rates to the $22 psf figure that Tenet represents as the low end of the market range. This analysis shows that the vast majority of Tenet's leases at the Atlanta Medical Center were significantly below $22 psf.

164.     The same holds true for these properties:

285 & 315 Medical Office Buildings, Atlanta          45 of 46 leases less than $22

---

[13]     Some of the leases were for *useable* square feet (USF) which is usually less than *rentable* square feet (RSF) because *useable* square feet does not include common areas. The re-measurement of feet in Tenet's marketing materials shows all leases with BOMA industry-standard RSF. Relator's analysis, Exhibit B, is extracted, in part, from Tenet's sales materials, which list each lease's current contractual feet and each lease's RSF. Since some of these leases are USF, Relator's analysis, Exhibit B, might overstate the extent of below-market leases *due to intentional mismeasurement*. However, USF leases' rate per foot should be higher than RSF rate per foot since it is a lease for "fewer" feet for the same size office. Consequently, USF leases may be under market not for mismeasurement, but rather for below market rates per foot

| | |
|---|---|
| 1136 Cleveland Medical Arts Center, Atlanta | 29 of 30 leases less than $16.50 |
| Hialeah Medical Office Building, Hialeah | 43 of 43 leases less than $20 |
| Palmetto Medical Plaza, Hialeah | 37 of 48 leases less than $20 |
| Medical Arts Building, Miami | 28 of 29 leases less than $20 |
| Ft. Lauderdale (4 properties) | 45 of 47 leases less than $21 |
| Farris Building, W. Palm Beach | 42 of 42 leases less than $20 |
| Birmingham (4 properties) | 73 of 77 leases less than $20 |
| Loewenberg Building, Memphis | 58 of 59 leases less than $21 |
| Doctors Professional Bldgs. I & II, Dallas | 13 of 34 leases less than $16 |
| El Paso (3 properties) | 36 of 41 leases less than $16 |
| W. Covina, CA | 18 of 21 leases less than $23 |
| Garden Grove, CA | 23 of 27 leases less than $23 |
| San Ramon, CA | 4 of 4 leases less than $27 |

165.    In many instances, the properties at the lower end of Tenet's "comparables" are not, in fact, comparable to Tenet's MOBs and, thus, should not even be included in an evaluation of market rates. As Relator's analysis clearly indicates, however, even if one accepts Tenet's estimation of the "range" of market rates, the vast majority of Tenet's offices are leased at rates well below that range.

166.    For example, Houston's 11302 Fallbrook MOB appears to be an on-campus property since it is described as having "an enclosed interior walkway to the Cypress Fairbanks Medical Center." Relator's spreadsheet shows it has an average rent of under $23 psf. But Tenet's low comparable (11455 Fallbrook St. at $20.50 psf.), is about two blocks away. The more likely comparable, 11301 Fallbrook, shows $26 psf. Supplemental information, page 36. All of the leases at 11302, including the typically more expensive first floor leases, fall below $26 psf. *See* Exhibit B.[14]

---

[14]    Similarly, Relator's spreadsheet shows that Houston's 1200 Binz (Park Plaza) averages $22 per square foot.  Only one of the so-called comparables is less ($21). Tenet's Supplemental information shows two comparables at $23, one at $25, one at $26 and one at $30.  Supplemental information, page 36.  Thus, it may be that the mid-range, $25-$30, is the more correct market value comparable. If so, then 44 of 48 leases in that building ,which are below $25 psf, would be below-market.

167.     Similarly, Houston's 1200 Binz (Park Plaza) averages $22 psf,[15] while all but one comparable is well over that price. Tenet's Supplemental information, Exhibit H shows two comparables at $23, one at $25, one at $26 and one at $30 psf. Supplemental information, page 36. Only one of the so-called comparables is less ($21 psf). Thus, it may be that the mid-range, $25-$30 is the more correct market-value comparable. If so, then 44 of 48 leases in that building are below $25 psf and would fall below market. See Exhibits H, B1 and B3.

### iii.     Tenet Required Prospective Purchasers to Keep Rates Below Market

168.     Indeed, in selling prospective purchasers on the value of the portfolio, Tenet acknowledges that its current rental rates do not reflect market value when it tells prospective purchasers that leases may be brought to market rates at the conclusion of the leases. Exhibit I.

169.     Tenet requires that for the first two years after the sale of the portfolio rents for current tenants cannot be increased more than the lesser of the CPI (*C*onsumer *P*rice *I*ndex) or 3%, even if a lease expires during that period and even if the market rate is higher. As Tenet states in the Offering Memorandum (Exhibit I):

> **Rent Escalation for Renewals (In-Place Leases)**
> **Tenet will require all rent increases for in-place leases be limited to the greater of 3.0% or CPI for the first 24 months after the sale of the Portfolio.**
> As such, the cash flow projections assume all in-place leases receive an annual rent escalation of 3.0% for the first 24 months of the analysis period. If the expiration of the in-place lease occurs within the first 24 months of the analysis start date (9/1/08 to 9/1/10), the annual rent increase upon renewal is 3.0% of the previous rent for the term of the lease renewal. For all in-place leases that expire within the first 24 months of the analysis start date, a one-year renewal term is assigned to the lease.
> A market rent is applied immediately to all vacant space and Tenet leased back space in the Portfolio. In addition, a market rent and market lease term is applied to all lease renewals that occur subsequent to the first 24 months after the analysis start date (after 9/1/10).

170.     Thus, not only does Tenet acknowledge that the current rental rates do not reflect market rates, but it indicates that it will contractually <u>prohibit</u> any purchaser from negotiating a market

---

[15]     These rates are at the time of the sale (exhibit B2), not at the leases' inception (Exhibit B3). However, the conclusion is the same for both – undermarket leases that confer benefits upon referring physician-tenants.

rate for current tenants, even after their lease expires, if that would require an increase of more than 3% of base rent.[16]

171.    The only possible reason for such a requirement is to ensure that current tenants continue to receive benefits intended as attempted inducements to stay in Tenet's building and continue to refer business to Tenet's hospital, even after the sale of the property. *See* Affidavit of Stephen Page, Exhibit T.

172.    This requirement appears to constitute an admission that Tenet intentionally seeks to subsidize its referring physicians.

### C. Benchmark Fair Market Values

173.    Various benchmarks illustrate Defendants' below-market leases and remuneration to referring physician-tenants.

#### i.    *Tenet's Own Explicit Benchmark Values in "Comparable FMV" Attachment*

174.    Defendants' rents to referring physician-tenants fall below Tenet's own benchmark fair market values.

175.    This is illustrated by leases at the Palmetto Medical Plaza, 7100 W. 20th Ave., Hialeah Fl.

176.    For example, the 2007 lease agreement for Dr. Angel Vidal, a tenant at 7100 W. 20th Ave., stated that it was providing 932 square feet to Dr. Vidal at "$17,242 for the lease year… or $18.50 per rentable square foot." [emphasis supplied]. April 3, 2006 letter signed by Ralph Alemena, CEO, and Dr. Vidal. Exhibit V. The $17,242 is calculated by multiplying 932 square feet by $18.50 psf.

177.    Tenet's "summary of lease terms," attached to Dr. Vidal's lease represents to the tenant that "comparable area-wide fair market value of similar space" is $17.50 – $20.50 psf. Exhibit V, p. 2.

---

[16]    Tenet would allow market rate rents only for current vacant space and on Tenet leaseback space (office space the buyer would lease to Tenet).

178.    The following year when Tenet re-measured the space for sale it determined that the Vidal office space was actually 1,000 *rentable* square feet. $17,242 divided by 1,000 feet results in a rate of $17.24 psf.

179.    Consequently, Dr. Vidal's de facto $17.24 per RSF falls below Tenet's own lowest fair market value of $17.50 per RSF. Additional benefits provided at that building, including medical waste removal, sharps containers and removal, janitorial, paper goods, and parking, add an even greater benefit. Therefore, the de facto rental rate falls even farther below the lowest fair market value.

180.    The same analysis applies to Dr. Ferreira who leased 1,353 RSF, Suite 801, in that same building at the same time, for the same "$18.50 per rentable square foot."

181.    Dr. Ferreira's annual rent was $25,030. That space was later re-measured as 1,466 RSF.

182.    Thus, he paid only $17.07 per RSF--also below Tenet's own lowest fair market value of $17.50 per RSF.

183.    The free 113 square feet at $18.50 per RSF provides an annual benefit to Dr. Ferreira of $2,090. However, at a more correct market rate of $28.50 (Exhibit B1), 113 feet benefits Dr. Ferreira by $3,220 per year. This does not take into account the additional business that may be generated by free space. For example, the free space may be enough for an additional examining room, which would allow the physician to see more patients per day.

184.    The RSF percentage understatements for these two physicians are 7% for Vidal and 8% for Ferreira (Exhibit B2, pp. 6 and 7 showing 93% for Vidal and 92% for Ferreira).

185.    Many leases in that building understate rentable square footage by even more, suggesting that those leases fall even further below Tenet's own benchmark fair market values. For example, Dr. Campos paid rent for only 59% of his office space; Dr. Mitrani paid rent for only 91% of his office space; Dr. Logan paid rent for only 84% of his office space; Dr. Ason paid rent for only 71% of his office space; Orthopaedic Spec. paid rent for only 84% of his office space; Dr. Leyva paid rent for only 76% of his office space; Dr. Yanez paid rent for only 87% of his office space; West Dade Pediatrics paid rent for only 73% of their office space; and many others. Exhibit B2, p. 6.

186.    Other Tenet properties show similar provision of free office space.

### ii. Tenet's Leases' Rate per RSF State Explicit Benchmark Values

187.    Even before Tenet's most recent 2006 Corporate Integrity Agreement, the leases stated that the rent charged was fair market value and also referenced the right to amend the lease to comply with "state or federal anti-kickback or self referral statutes" *See, e.g.* Exhibit X, 2004 Ariel lease at para. 37, p. 36.

188.    For example, most of 7100 W. 20th Ave., Hialeah building's leases expressly stated that RSF was measured by BOMA standards. *See* lease excerpts for sample years at exhibit U, showing express terms of lease stating BOMA and "rentable square feet" in 2002 (Dr. Pagan), 2003 (Dr. Pagan), 2004 (Ariel Gastroenterology), 2005 (Dr. Fields), 2006 (Dr. Pazos).

189.    Tenet distinguished between *rentable* and *usable* square feet.[17] For example, Ariel's 2004 lease for Suite 412 expressly stated that he was being rented 1709 *rentable* square feet (at $16 psf, $27,344 per year) but that his improvement allowance was based on 1517 *usable* square feet" (at $25 psf, $37,925 [18]). Exhibit X. Same for 2003 Pagan lease, Exhibit Q.

190.    The Ariel lease, which stated 1,709 RSF, was later re-measured as 1,838 RSF. At $16 per RSF, the free 129 square footage (1,838 – 1,709) that Ariel received was valued by Tenet at $2,064 per year and constituted a minimum benefit to Arial of $12,384 based on the entire six-year lease. Further, since the lease had a COLA, the value of the hidden benefit of $2,064 increased each year of the lease by the amount of the COLA.[19]

---

[17]    Generally speaking, *usable* square feet includes only space within an office while *rentable* square feet includes usable plus a portion of the common area. *Rentable* is the industry standard for commercial leases.

[18]    As described at paragraphs 247 - 271, improvement allowances are another way to disguise tenant subsidies. A $37,925 improvement allowance, equal to 17 months' rent, raises questions as to the *bona fides* of the anticipated "improvements." Further, Ariel's TI allowance substantially exceeds the $15 benchmark assumption in Exhibit C, Offering Memorandum, PDF page 12.

[19]    Ariel's rent increased in 2006 by $1,129.85 due to a CPI increase of 4%. Although the actual CPI increase exceeded 4%, his leases capped CPI at 4%. As discussed at paragraph i this is another covert way in which Tenet subsidized leases rather than operate as a typical commercial office building.

191.    Tenet gave Arial a total benefit for six years of over $12,384, and this benefit constitutes valuable remuneration. This does not take into account the additional benefit of revenue that may have been generated by the additional free square footage of office space.

192.    Exhibit Z lists a sample of leases that expressly state both "rentable square feet" and BOMA standards.  It shows the number of "free RSF," the market value per RSF as stated in the lease, the annual value of the free RSF, and the total value of the free RSF based on the duration of the lease.

193.    For example, Dr. Perez entered into a six-year lease for 2,316 RSF at $15 per RSF. The rented space is shown to have been actually 2,983 RSF-- a difference of 667 RSF. At the "fair market value" expressly stated in the lease, $15 per RSF, the unaccounted for 667 feet is worth to Dr. Perez a minimum of $10,005 per year for six years, a total of $60,030. This calculation ignores the cost of living increases built into the leases and the additional revenue that may have been generated by the additional free square footage of office space.

194.    Obstetrics and Gynecology Quality Care was given a similar annual benefit of $14,430 in the form of free office space.

195.    Some of the exhibit Z leases are listed below and show the full value of the benefit provided to physicians annually and over the course of the lease based on the "market value" rate per square foot stated in the lease itself. As discussed, beginning at paragraph 213 below, even this claimed market value rate is below actual market value.


Hialeah Medical Office Bldg. 777 E 25 St, Hialeah FL

| Tenant | Lease Years | Free RSF | Lease $/ RSF Rate | Yr 1 KB Benefit | All Years Benefit |
|---|---|---|---|---|---|
| Francisco Hernandez, M.D. | 5 | 1,306 | $18.50 | $24,161 | $120,805 |
| Xiques and Rangel | 5 | 384 | $18.50 | $7,104 | $35,539 |
| Gerardo Perez, MD | 6 | 667 | $15.00 | $10,005 | $60,030 |
| Carlos Vallejo, MD | 5 | 316 | $14.50 | $4,582 | $22,910 |
| Julian Yong, MD | 5 | 322 | $14.50 | $4,669 | $23,345 |
| Jose Aldrich, M.D., P.A. | 5 | 335 | $17.00 | $5,695 | $28,475 |
| Celestino Castellon, M.D. | 5 | 380 | $18.50 | $7,030 | $35,150 |
| Jose Baca, M.D. | 3 | 361 | $18.50 | $6,679 | $20,036 |

Palmetto Medical Plaza, 7100 W 20th Ave, Hialeah FL

| Tenant | Lease Years | Free RSF | Lease $/ RSF Rate | Yr 1 KB Benefit | All Years Benefit |
|---|---|---|---|---|---|
| Patrick J. Barry, M.D. | 2 | 924 | $20.50 | $18,942 | $37,884 |
| Palmetto Fertility , | 7 | 2,842 | $20.50 | $58,261 | $407,987 |
| Steven M. Fields, M.D., P.A. | 5 | 964 | $18.50 | $17,834 | $89,170 |
| Ariel Gastroenterology, PA | 6 | 129 | $16.00 | $2,064 | $12,384 |
| Edward L. Gheiler, M.D. | 6 | 200 | $18.50 | $3,700 | $24,035 |
| Obstetrics and Gynecology | 6 | 130 | $18.50 | $2,405 | $14,430 |
| Plastic Surgery Center | 1 | 391 | $20.50 | $8,016 | $7,994 |
| 21st Century Oncology, Inc. | 5 | 210 | $18.50 | $3,885 | $19,425 |
| Julio Torres, M.D., P.A. | 5 | 120 | $19.50 | $2,340 | $11,706 |
| Martinez-Alba, Jr., M.D. | 3 | 61 | $20.00 | $1,220 | $3,660 |
| Jose Gamez, MD | 3 | 72 | $20.50 | $1,476 | $4,428 |
| Alhambra Medical | 5 | 260 | $20.00 | $5,200 | $26,000 |
| Andres Vega, M.D., P.A. | 5 | 227 | $20.00 | $4,540 | $22,700 |
| Siguanea, LLC | 5 | 222 | $20.00 | $4,440 | $22,200 |
| Victor Pazos, M.D., P.A. | 5 | 158 | $20.50 | $3,239 | $16,195 |
| Fernandez-Bombino | 1 | 174 | $23.00 | $4,002 | $4,002 |
| Luis Cruz, M.D. | 3 | 107 | $23.00 | $2,461 | $7,383 |
| Orlando Garcia DO, PA | 5 | 126 | $15.00 | $1,890 | $9,455 |

196.     As the sample above shows, the benefit given by Tenet to physician-tenants at the inception of their leases ranges from thousands to tens of thousands of dollars.

197.     Tenet's marketing materials show that its leases originally used RSF and that they were re-measured in *rentable* square feet." Exhibit C, Offering Memorandum, PDF page 9.

198.     There are few ways that an office measured properly using BOMA standards would change size from one year to another. For example, an increase in office size might be due to incorporating additional space in an adjacent office or by moving a wall. Such an increase would be reflected in a lease. However, since a building structure is not flexible and cannot expand, if one office increases in space then an adjacent office must decrease. There is no evidence that this occurred in Tenet's buildings. Exhibit B2.

199.     Tenet's Offering Memorandum and Exhibit B2 show Tenet did not reconfigure hundreds of physicians' office spaces. Nor did it expand 31 of its buildings. As it stated in its marketing

materials, the spaces were simply "re-measured." Exhibit C, Offering Memorandum, PDF page 8 "recent BOMA space re-measurements".

### iii.     The Parties' Joint Benchmark Fair Market Values

200.    Defendants charge physician-tenants rents below fair market values.

201.    Exhibit K is an appraisal performed by an independent appraiser who was selected jointly by Tenet's appraiser and Relator's appraiser to determine the fair market value of two medical office suites located within the pedestrian mall area of the Palmetto medical office building complex within the Palmetto General Hospital campus. Exhibit K page 1.

202.    Tenet leases two medical offices from Relator in his building on their hospital campus. The two medical offices are a short inside walk to Tenet's medical office building and to Relator's medical office building, all at 7150 – 7160 W. 20th Ave., Hialeah, FL.

203.    The Exhibit K appraisal analyzes market rent and discusses the earlier appraisals performed by appraisers hired by Tenet ($35 psf) and by Relator ($40 psf). Exhibit K page 3.

204.    The appraisal's most relevant comparable office is also in the mall level of the Palmetto Hospital complex ("rental number one"). Tenet leased that 16,406 square foot space from Relator at $36 psf based on a 25-year lease executed in April 2008. Exhibit K, page 5.

205.    Often, larger spaces, longer leases and more financially secure ("anchor") tenants enjoy lower rates. Had this space been divided into smaller spaces and leased for shorter periods to less financially secure tenants it may have leased for an even higher rate than $36 psf.

206.    The appraisal concluded that the market value as of September 2009 was $38 psf on a full-service basis. Exhibit K page 8.

207.    Dr. Pagan renewed a lease for $20 psf on April 1, 2007. But Exhibit K shows that Tenet considered that space worth $36 psf based on the amount Tenet itself paid Relator for space rented from him in his building, a few minutes walk down the hall from Dr. Pagan's office. Exhibit K, p. 5 "Rental 1" paid by Lifemark Hospitals.[20] The discrepancy between $20 psf and

---

[20]    Defendants appear to consider 13 months a reasonable time frame to compare market rates since they used 13 month old "market studies" to justify their leases as Stark compliant. Exhibit V, p. 4 using June 1, 200<u>5</u> "comparable area-wide Fair Market Value" for a July 1, 2006 lease (Ferreira) and a June 1, 2006 Lease (Vidal, p. 2).

$36 psf for substantially the same location has no apparent rational basis other than suggesting an improper benefit given to a referring physician.

208.    Even the highest 2008 rate charged by Tenet to its tenants falls well below the $36 psf rate it paid for space in the same medical complex in April 2008. Exhibit B1.

209.    With respect to the appropriateness of the rates found to be comparable in the 2009 study (exhibit K), the study reviewed comparable offices over a two-year period and included five comparable rentals negotiated in 2008 and 2009. Exhibit K, page 5. Similarly, although Tenet's documents state that 12 months is generally an appropriate period for determining comparables, on at least one occasion Tenet used 13 months. *See* Exhibit V, p. 4 using a June 1, 2005 "comparable area-wide Fair Market Value" for a July 1, 2006 lease (Ferreira).

210.    Many other 2007 leases given by Tenet to physician-tenants range from a high of $21 psf and lower.

211.    It is not plausible that Tenet was willing to pay Relator an extra $6,482,400 [21], the result of paying $16 more per square foot over the purported $20 per square foot "market value". Rather, the $20 psf Tenet charged to its tenants was under market in April 2008.

212.    Tenet charged less than the market value to attempt to induce patient referrals.

### iv.    *Relator's Benchmark Studies Show Leases Below Fair Market Value*

213.    Defendants charge physician-tenants rents that fall below fair market values.

214.    Exhibit B1 (graphic summary below) shows a summary and supporting detail for Tenet's South Florida office space for 2005 through 2008.

---

[21]    16,206 feet x $16 difference = $259,296 per year.  $259,296 x 25 years = $6,482,400.



215.    Page 1 (reduced graphic above) shows three distinct average rates for Tenet. With respect to 2008, for example, the highest Tenet number, $19.41, is the average face value of the leases. This was based on the number of square feet stated in the lease. The next number, $17.32 is the rate per square foot based on the offices' actual size, following Tenet's "re-measurement" of the space.

216.   The 112% ratio between the two numbers ($19.41/$17.32) shows that the average contractual stated feet was 12% below the average actual feet. Exhibit B-1, page 1.[22] As discussed at paragraphs 245 and 246, free space provided through misstatement of floor space was greater for physician-tenants less or even a negative number for non-referrers.

217.   The third number, $14.32, shows an additional three dollars per square foot reduction based on free services. Exhibit B-1, page 1.

218.   Exhibit B-1's three dollars ($3.00) psf reduction is an especially conservative amount since the appraiser selected jointly by Tenet's appraiser and Relator's appraiser estimated that janitorial and utility expenses are about four dollars ($4.00) psf. Exhibit K pages 6, 7.

219.   Contract rates psf charged by Defendants in their South Florida medical office buildings are listed in chronological order by lease date at pages 6 through 13 of exhibit B-1.

220.   Measured correctly, the rates for the 2008 leases (Ex. B-1, p. 13) range from $14.60 up to $21.21 psf (before reduction for janitorial and utilities).

221.   Exhibit B1 also shows rates by South Florida medical office buildings at pages 3 – 5. Although many of these office buildings are not located on hospital campuses and are thus less desirable and must charge lower rates, the $29 psf in 2008 is approximately double that charged by Tenet for its South Florida offices.

222.   Tenet's lowest effective rates are enjoyed by ground floor tenants. Ground-floor space typically commands a rental premium. Exhibit K page 7. One explanation for giving lower rents to those with more desirable office space is that it is intended as an attempt to induce referring physicians to place their offices in Defendants' hospital campus medical office buildings.

223.   The graphic comparing benchmark rates to Tenet's rates illustrates not only that Tenet charged below-market rates, but also suggests that floor space was used to manipulate the rate. The graphic shows that over four years the benchmark mean rate and Tenet's leases' contract rates both increased at a constant rate by approximately the same amount.

---

[22]   For example, if a lease showed 1,000 feet and rented for $19.41 per foot the annual charge would be $19,410. If the same space were later determined to be 1,120 feet (the 12% difference), then the effective rate would be $17.32 ($19,410 / 1,120 feet).

224.     However, the 2007 downward drop in the effective rate (as determined after re-measurement) shows that those 2007 leases were more significantly understated in actual space (by 5%) than in other years.[23]

225.     Tenet's effective rate reduction through greater understatement of square feet for 2007 (the additional 5%) suggests it tried harder to secure tenants that year, a theory consistent with that suggested by Tenet's VP, Mr. Bonrepos (Exhibit A), and by these buildings' financials showing that they were not run for a profit. See below.

226.     The same analysis in Houston also shows Tenet's rates below benchmark medical office building rates. Exhibit B3. For example, the Houston market rate is over $22 psf (*id*. at p. 2), but Tenet charges just over $17 psf, before reduction, and just over $14 psf after application of a $3 per square foot expense reduction. (*id*. at pp. 3 - 8).

227.     The same analysis in Atlanta also shows Tenet's rates were below benchmark medical office building rates. Exhibit B4. The Atlanta market rate is over $25 psf (*id*. at p. 2, 2008), but Tenet charges just over $17 psf, before reduction, and just over $11 psf after application of a $3 per square foot expense reduction. (*id*. at pp. 3 - 4).

228.     The same analysis in Memphis, Tennessee also shows Tenet's rates were below benchmark medical office building rates. Exhibit B4. The Memphis market rate is over $20 psf (2008), but Tenet charges just over $18 psf, before reduction, and just over $13 psf after application of a $3 per square foot expense reduction. (*id*. at pp. 3 - 4).

229.     Similarly, when Relator evaluated Tenet's entire portfolio in consideration of his contemplated purchase he found it was "rented at below-market rates and that Tenet gave substantial concessions and other benefits to physician tenants." Osheroff Affidavit, Exhibit S.

### D.  Remuneration Paid to Physicians Illustrated by Non-Referring Tenants

#### i.  *Higher Rates for Non-Referrers*

230.     That Tenet gave benefits and remuneration to physicians can also be shown by contrasting the rates it charged to tenants who were not referral sources.

---

[23]     The 5% is the difference between 2007's 117% ($18.48/$15.74) increase to actual, and 2008's 112% ($19.41/$17.32).

231.     For example, at the Hialeah Medical Office Building, Marplaco, Inc. d/b/a Hialeah Gift Shop– clearly not a referral source for the hospital-- pays the highest rent per square foot of all tenants. Exhibit B.

232.     On July 1, 2007, Marplaco, Inc. d/b/a Hialeah Gift Shop entered into a three-year lease for Suite 418 for $19.48 psf. Exhibits L and B.

233.     The same day, D. Adrian Radulescu, M.D., P.A., an internal medicine practice, entered into a three-year lease (Suite 518) for $8.76 psf and Rosanna Lopez, M.D., an internal medicine practice, entered into a one-year lease (Suite 516) for $11.82 psf. Exhibit L, L2.

234.     Two months later, Tenet leased Suite 416 to Digestive Disease of South Florida at $14.44 psf. Three months earlier, April 1, 2007, Tenet entered into three physician leases (Suites 411, 208 and 106) for the amounts of $12.14, $13.29 and $15.05 psf, respectively. Exhibits L, B.

235.     The gift shop's rental rate is a dollar per square foot higher than the next highest tenant, $3.66 more than the third highest tenant, and approximately $5 higher than the median rent. The only explanation for this is that the hospital has no incentive to subsidize the gift shop since it is not a referral source.

236.     Similarly, the Garden Grove, California MOB entered into 11 leases in 2007. Exhibit B. Eight of those leases were for physician practices that referred patients to Tenet and were charged rates that ranged from $18.83 up to $22.14 psf. The remaining three leases were for non-referring businesses and ranged from $22.38 to $25.53 psf. Exhibit B. The highest referring physicians' rates were lower than the lowest rates for non-referring businesses.

237.     Eight leases from March 1 to October 11, 2007, show the disparity in rates for non-referrers:

| Suite | Name | Start | Feet | Rate/ft |
|-------|------|-------|------|---------|
| 100 | RAI Care Centers | 01/03/07 | 3,561 | **$25.53 non-referral** |
| 504 | Tantam Medical Group | 02/26/073 | 2,664 | $18.83 |
| 303 | Francis S. Lee, M.D. | 03/01/07 | 1,225 | $21.58 |
| 306 | Peter Wang, M.D. | 05/15/07 | 1,259 | $21.58 |
| 307 | Lab Corp of America | 05/15/07 | 1,104 | **$23.38 non-referral** |
| 502 | Fountain Valley Cardiology | 07/01/07 | 1,006 | $21.58 |
| 305 | James Park, DO | 07/01/07 | 943 | $21.60 |

- 42 -

| 200 | RMS Lifeline, Inc. | 08/01/07 | 3,523 | **$22.38 non-referral** |
| 308 | John Van, DDS | 09/15/07 | 1,151 | $21.58 |
| 408 | Terry R. Rhee, M.D. | 10/11/07 | 1,146 | $21.56 |
| 206 | Pediatric Neonatology | 12/13/07 | 2,329 | $22.14 |

238.    Sometimes commercial landlords provide lower rates to tenants leasing larger spaces. At the Garden Grove California MOB, the exact opposite happened with non-referring tenants of larger office spaces.

239.    Non-referring RAI Care Centers of Southern California, a dialysis clinic, entered into a lease on January 3, 2007, for 3,561 feet at the rate of $25.53 psf. The second-largest lease was non-referring RMS Lifeline, for 3,523 square feet at the rate of $22.38 psf (August 1).

240.    In contrast, the largest physician lease, entered shortly after the RAI lease was executed, was the Tantam Medical Group a family practice, which leased 2,664 square feet at $18.83 psf.

241.    The $6.69 per square foot difference between Tantam Medical Group and non-referring RAI is material. Had Tenet charged Tantam $25.53, Tantam would have paid $68,000 per year rather than $50,172-- a benefit exceeding $90,000 (over $18,000 per year for the five years of the lease).

242.    Although $6.69 seems at first look an insignificant amount, the $6.69 per foot difference yields the same financial benefit for Tantam as if Tenet had expended $18,000 a year ($1,500 a month) to lease its referring physicians a BMW 750 for Pumipak Tantamijark, M.D., F.A.A.F.P., and a Mercedes 600 for Srivimol Tantamijark M.D., F.A.A.P.

   ii.    *Less Mismeasurement for Non-Referrers*

243.    Defendants' intentional *under*statement of floor space (provision of free space) in leases given to physician-tenants is illustrated by its *over*statement of floor space in leases for the very few non-referring tenants.

244.    Overstatement of office measurement acts to increase rent, a practice among some commercial landlords who seek to profit from their buildings. *See* para 8, Exhibit T Affidavit of Stephen Page, paragraph 12.

245.    For example, in the North Medical Bldg. 4900 W Oakland Pk, Ft Lauderdale, nearly all of the leases were understated at inception notwithstanding that nearly all the leases expressly

show "rentable square feet" and that they are measured using BOMA standards-- as they were when the lease was "re-measured." However, the few leases that were overstated include non-referring tenants Subway Real Estate Corp., (+ 6%), American Ambulance Service (+ 2%), West Oakland Park, LLC, a physician's billing service (+5%), and a smaller understatement for Guidos Pizza (-4%). 24

246.    Similarly, in 315/318 Boulevard, N.E., Atlanta, Defendants understated the majority of leases in the building by more than 10%. This understatement is significant in that it lowers the rent in these offices by a similar amount, more than 10%. However, two of the leases overstated square feet: Atlanta Pathology (+10%) and Graduate Medical Consultants. Pathologists do not refer to hospitals. Graduate Medical Consultants is out of business. Their business is unknown.

### E. Excessive Tenant Improvement Allowances Exceed Tenet's "Benchmark"

247.    In commercial leases, arms-length market value of tenant improvement ("TI") allowances varies by the needs of a particular tenant and the condition of a particular space.

248.    Tenant allowances for _actual_ improvements are typically lease specific. There is no standard value for a physician-tenant's TI needs with respect to a particular office. Particular needs for a particular physician-tenant's medical practice vary, as do the conditions of physical space vary from office to office.

249.    Consequently, a "standard" TI allowance might not relate to improvements. Rather, it may be used as a financial inducement to a potential tenant to enter into a lease while maintaining the appearance of charging a commercially reasonable fair market value rate.[25]

250.    TI allowances can be averaged over large groups to derive a benchmark market standard.

---

[24]    Five re-measured spaces were shown to have been measured correctly in the first place. All were identical size, 126 square feet, which appear to be storage spaces. Although the lease dates ranged from January 1, 2003 for Dr. Kesdan until February 1, 2007 for Diagnostic Cardio, the rates did not change over the four years and they all rented at five dollars per square foot, about one third the rate for office space.

[25]    For example, a non-hospital commercial landlord might use characterize a rent credit as a "tenant improvement' to comply with a loan provision that requires rents to be no lower than a specified dollar amount per foot, or to defer taxable income from early in the lease to later in the lease.

251.    Tenet itself sets forth a benchmark market standard for TI allowances in the assumptions it used for projecting future revenue. Tenet assumes a rate of $0 to $15/RSF for a new lease and between $0 and $2.50/RSF for a renewal. Exhibit C, Offering Memorandum, PDF page 12. As alleged below, Tenet's actual TI allowances were rarely if ever $0 and frequently exceed the high range of these amounts.

252.    A review of Tenet's leases found many renewals with TI allowances. This suggests a benefit provided to attempt to incent tenant to remain in the building and provide patient referrals.

253.    Since the buildings are not operated to earn income (discussion at paragraph 294, Sub-section F.   below) one purpose for the TI allowances to physician-tenants was to encourage potential referral sources to lease offices at Defendants' hospitals.

254.    As discussed beginning at paragraph 262, Defendants often provided "standard" TI allowances that were similar or identical from tenant to tenant.

255.    A review of the leases also suggests that, in many cases, Tenet provided remuneration to physician-tenants in the form of excessively generous tenant improvement ("TI") allowances.

256.    For example, when Obstetrics and Gynecology Quality Care, Inc., an OB/GYN practice in Palmetto Medical Plaza, moved to a new suite in the building in August 2005, Tenet provided a TI allowance of $34,810, or $24.99 psf. This amount is equal to approximately 40% of the $87,024 rent to be paid by the practice over the entire three-year term of the lease.

257.    In other words, Tenet agreed to pay $34,810 for tenant improvements to move the tenant to a new office, in return for a total of $87,024 in rent over a three-year period. There appears to be little business justification for such an excessive TI allowance for a three-year lease other than to attempt to induce or reward referrals.

258.    The amount also exceeds the $15 psf benchmark assumption in Exhibit C, Offering Memorandum, PDF page 12.

259.    Similarly, also in Palmetto Medical Plaza, Tenet provided a $62,325 ($23.95 psf) TI allowance to Dr. Victor Pazos, a cardiologist, for a five-year lease. This TI allowance is approximately 20% of the $300,325 base rent payable over the five-year lease term – in essence, the TI allowance amounted to giving the tenant one year's worth of rent.

- 45 -

260. In Tenet's Park Plaza MOB in Houston, Texas, one tenant, Advanced Dermatologic Surgery, P.A., Suite 1040, received a TI allowance of $45 psf, in addition to $7,500 rent abatement, upon execution of the original lease in 2002. Upon renewal of the lease in 2007, Tenet agreed to an additional TI allowance of $4.36 psf.  Advanced Dermatologic referred patients to Tenet.

261. These amounts also exceed the $15 psf benchmark and the $2.50 psf benchmark assumptions in Exhibit C, Offering Memorandum, PDF page 12.

262. Several other Park Plaza MOB tenants received flat rate TI allowances of $30 psf, including: Aesthetic Plastic Surgery Center, L.P Suite 1000; Benjamin Portnoy, M.D., Suite 1020; Louis Berman, M.D., Suite 1130; Juan H. Serrano, M.D., P.A., Suite 1195; Claire H. Chang, M.D., P.A., Suite 1220; Chok Keung Lee, M.D., Suite 1388; Internal Medicine Specialists, P.A., Suite 1410; and Oncol Therapeutics, P.A., Suite 1490. These tenants referred patients to the Defendants.

263. Since the physical condition and layout vary from office to office, and since individual physicians' needs vary, it is unlikely they all required actual improvements costing exactly $30.00 per square foot.

264. The above amounts are also double Tenet's $15 psf benchmark assumption in Exhibit C, Offering Memorandum, PDF page 12.

265. In El Paso, Texas, at the 1600 Medical Building, a referring anesthesiologist Dr. Oscar Vega Junior entered into a five-year lease in March 2007 for $13.57 psf and was given a $25 psf (approximately two-years rent) TI allowance.

266. Also at the 1600 Medical Building, the first floor Harmony Wellness Clinic, a referring tenant, entered into a three-year lease on December 1, 2006 at $14.26 psf and enjoyed a $15 psf TI allowance.

267. At the 1151 N. Buckner building, Dallas, Texas, Dr. Goldings entered into a two-year lease in March 2007 at $16.85 psf and received a TI allowance of $7.50 psf. Dr. Koney entered into a lease January 2007 for $16.44 and received a TI allowance of $7.50 psf. The 25% "improvement allowance" is consistent with Dr. Barker, who has a September 2005 four-year lease for $10.68 psf and an $11 psf tenant improvement allowance.

268.    The pattern of 25% "improvement allowances" suggest that they are not for purported improvements so much as for a rent subsidy intended to encourage tenants who are current or potential referral sources.

269.    Characterizing office space as lower cost storage space is another way to provide a covert benefit to tenants.

270.    A few other doctors in the 1600 Medical Building also rent storage space running from 183 to 400 square feet on the third floor (where there are more medical offices) for less than four dollars per square foot.

271.    The practice of storage space subsidies also occurs in the 4850 W. Oakland Park building in Fort Lauderdale, Florida. Five leases in that building enjoy supplemental storage space of 126 square feet each for five dollars a square foot.

272.    There are few bona fide reasons to convert higher value offices into lower revenue storage space.


### F.  Additional Benefits Provide Remuneration

273.    Off lease benefits and non-compliance with a lease's written terms results in a prima facie violation of the Stark and Anti-Kickback statutes for which no exemption applies.


### i.    *Failure to Enforce and Non-standard Terms, and Off-lease Benefits*

274.    Tenet provides additional benefits and further lowers their *de facto* market rates through various non-standard lease terms, failure to enforce lease terms and off-lease benefits.

275.    Relator has particular knowledge of benefits with respect to Tenet's building at Palmetto hospital, Hialeah, Florida, where he owns and operates a competing on-campus medical office building. Exhibit S, Affidavit of Marc Osheroff. At Tenet's building Tenet provides the following benefits:

- Medical waste "red bag" collection service
- Sharps collection service
- Electrical and other utilities
- Parking
- Janitorial service

- Paper goods
- Utilities

276.   The parties' joint appraiser estimated these benefits to physician tenants at $4 per RSF. Exhibit K, pp. 6 and 7.

277.   Tenet's MOB janitorial service includes medical office paper goods that are more expensive than regular office paper goods. Medical office paper goods includes not just toilet paper and paper towels, but also expensive papers such as those used to drape examination tables, antibacterial hand towelettes and wipes etc.

278.   Mr. Osheroff's building charges market rate ($50 to $500 per month) for sharps containers and collections, and medical waste disposal. Osheroff Affidavit, Exhibit S, paragraph 9.

279.   Sharps containers and collections and medical waste disposal are  additional benefits provided at no cost to many of Tenet's referring physician-tenants. *Id.*

280.   Most leases incorporate annual rent increase provisions to cover "cost-of-living" increases and increases in common area maintenance, such as insurance, property taxes and maintenance and utilities.

281.   Although Defendants' leases allow charges for increases in common area maintenance ("CAM") (See Exhibit X, paragraph 10 "Operating Expenses", pdf. p. 17) it appears that Tenet waives this expense.

282.   Tenet disclosed hundreds of spreadsheets showing cost of living increases applied to base rent. But none of those spreadsheets showed charges for Operating Expenses' increases. Failing to charge tenants for increases in operating expenses provides a benefit to tenants.

283.   Another way Tenet provides benefits to many tenants is by limiting the cost of living increase rather than charging the full increase. This is not a commercially standard practice and results in an increasing valuable benefit to tenants over the life of the lease. Failure to make adjustments to base rent for increases in cost of living and increased operating expenses also causes leases to drop below market, as discussed at subsection V. C. (ii) beginning at paragraph 157 above.

284.   The failure to charge for CAM, or increases in CAM, is a benefit for physician tenants.

285.    Further, over time, nearly all leases fall below market as a result of Tenet's decision not to charge for CAM, or increases in CAM. Exhibit B2.

### ii.    *Tenet Barters Rent for Certain Physician's Services*

286.    Tenet barters rent for physicians' services.

287.    For example, Tenet offset rent in conjunction with a $45,000 "settlement" with Dr. Otero (Ariel Gastroenterology). Exhibit X1, Ariel Settlement.

288.    The terms of the "settlement" are unknown and it is unknown whether the amount owed to Tenet was reduced in consideration of referrals. *Id.*, Ariel Settlement.

289.    Exhibit X1 shows that Dr. Otero owed money to Tenet that he was working off by being on call in the ER. In addition, since he also owed $11,000 in back rent, Tenet bartered "ER On Call" in exchange for back rent he owed ($4,246 in October and $6,746 in November 2007). Exhibit X1.

290.    Nothing in the lease allows for in-kind payment. Exhibit X.

291.    The lease requires "all payments in United States funds, payable to, and mailed or personally delivered to … Tenet Healthcare Corporation …" and the lease expressly prohibits "abatement deduction or set off." Exhibit X, paragraph 3, pdf page 10, and 3(d) p. 11.

292.    Thus, Dr. Otero enjoyed an $11,000 benefit, in addition to the submarket lease alleged Exhibit B2.

293.    Even if Defendants were to prove that the fair market value of Dr. Otero's services equals $11,000 (as an affirmative defense), non-compliance with the lease's written terms makes the $11,000 benefit a prima facie violation of the Stark and Anti-Kickback statutes for which no exemption applies.[26]

---

[26]    Tenet has been running television and bus ad campaigns for lap band and weight loss surgery in the South Florida market by promoting individual physicians. Some of this work is referred by gastroenterologists. Consequently, Tenet appears to confer benefits upon physicians who refer lap band and weight loss surgery patients to its hospitals in South Florida, which includes gastroenterologists. Further, free advertising for referring physicians is yet another form of improper kickback, but not alleged in this complaint. Finally, Relator notes that barters, such as those in Exhibit X1, is a method by which some avoid recording and reporting income.

### G.  Remunerative Intent Shown by Failure to Seek Market Return

294.    Tenet's failure to operate its medical office buildings as a business seeking an ordinary market return suggests that a purpose in providing the above-described remuneration was to attempt to induce physicians and other healthcare providers to make referrals to Defendants.

295.    For example, Tenet discloses that the Palmetto building receives a triple net per square foot rent of $13.89 (original p. 93, "Market Rent Summary") before expenses of $11.11 psf under "Operating Expense and Real Estate Tax Summary." Exhibit I, Second Tenet Offering Memorandum New, original pp. marked 92 and 93, Exhibit I pdf pp. 5 and 6. [27]

296.    In actuality, as stated in Exhibit I at p. 91 (pdf p. 4), and as seen by Relator in his review of the leases, most of these leases are full-service gross (FSG).

297.    The difference between a full-service gross (FSG) and a triple net lease (NNN) is significant. A full-service gross lease is familiar to residential tenants. A landlord and tenant reach an agreement on a fixed dollar amount and that is the rent.

298.    A triple net lease (NNN) requires payments in addition to the base rent. As Tenet states "all leases under the triple net lease structure are responsible for a proportionate share of operating expenses, real estate taxes and management fee based on RSF." [28]  Exhibit I.

299.    Relator's South Florida medical office buildings' expenses average from $8-$13 RSF per year. Tenet shows its Miami-Dade buildings' operating expenses as ranging from $9.60 to $11.11 RSF. Exhibit I, p. 96 (pdf p. 5).

300.    Whether intentionally or otherwise, Tenet misstates in Exhibit G, p.1 that its rents are triple net (NNN). The misstatement makes it appear that Tenet charges market rates. Exhibit G, page 1, states that "rental rates for medical office buildings in the Hialeah and Miami areas range from $20 - $34 per square foot on a full-service gross basis." The building financial details on pages 2, 3 and 4 show on the bottom row of each page respectively, under the subtitle "Building Financial Details" Market Rent PSF (NNN) :

---

[27]    The $11.11 cost per square foot appears to be *understated* as it appears to represent an average of expenses for 2005, 2006, 2007.  Exhibit I. However, in Miami-Dade County, taxes, insurance and most other expenses increase from 2006 to 2008.

[28]    RSF, as explained above, includes in tenant's square feet a proportionate share of common area such as lobbies and hallways.

| | |
|---|---|
| Hialeah Medical Office Building, 777 E. 25th St. | $11.40 |
| Palmetto Medical Plaza at 7100 W. 20th Ave., Hialeah | $13.89 |
| The Medical Arts Building at 1190 N.W. 95th St. | $15.14 |

301.   If the leases were in fact triple net (NNN) as claimed in Exhibit G, then physician-tenants would be paying the stated amount ($11.40 - $15.14) plus an additional $9.60 to $11.11 RSF; the total rent in that scenario would be at the bottom range of what Tenet claims is the market rate.

302.   However, these leases are mostly operated full-service gross, as evident to Relator by a review of the leases, discussions with tenants, and as disclosed by Tenet at exhibit I, page 91 (PDF page 4):  "The majority of the portfolio currently operates under a full-service gross lease structure with the exception of four properties located in Fort Lauderdale Florida…"

303.   By claiming that its leases are triple net rather than full-service gross, Tenet understates its South Florida rentals by the approximately $10 psf that it does not charge its tenants.

304.   One consequence of such low rents is that many of Tenet's buildings are operating at a loss.

305.   For example, the brochure shows that Palmetto Medical Plaza charges $13.89 psf, Exhibit G, and incurs expenses of at least $11.11 psf (Exhibit I).

306.   However, the resulting profit is not $2.78 per square foot ($13.89 – $11.11) since the $11.11 expense is RSF and the $13.89 revenue is based on a lower number of understated contractual feet.

307.   Rather, the building is run at a loss. Tenet discloses that in 2007, for example, the Palmetto Medical Plaza incurred a loss of $117,203. Exhibit J 2007, Palmetto 2007 MOB Inc. Accord, Exhibits J 2005 and J 2006.

308.   However, even the $117,203 loss was an improvement from the losses in 2005 and 2006.

| | |
|---|---|
| Exhibit J 2007 | $117,203 loss |
| Exhibit J 2006 | $501,688 loss |
| Exhibit J 2005 | $420,121 loss |

309.   Similar analyses show that the other buildings in Exhibit B were not operated as commercial profit-making real estate investments.

310.    Explanation for managing real estate at a loss is explained in Tenet's annual report and by it VP for Real Estate.

311.    Each hospital admission is important to Tenet since Tenet earns over $11,000 in net revenue for every patient admission. Exhibit D at 33 (pdf p. 35). Consequently, referrals are important to Tenet's overall revenue.

312.    Tenet's VP Bonrepos explains why the priority is to "schmooze the doctors to bring them to the campus" rather than make money:

>  "We don't, as a company, want to own real estate," he says. "We want what happens because of the real estate."   ...

>  The relationship a hospital or health system has with the owner of its MOBs [medical office buildings] is so important, says Mr. Bonrepos, that getting the highest price for the properties is not the main priority.

>  "We're asking the CEO to schmooze the doctors to bring them to the campus, then in the next minute we're asking the CEO to go knock on the door and collect rent," Mr. Bonrepos says. "**One of those things is not going to get done**. ... It's too much to ask." [29]
>  [Emphasis supplied.]


## VII. COUNTS

313.    Tenet has submitted, and continues to submit, numerous claims for payment to Medicare, Medicaid, and other federal healthcare programs arising out of referrals from physician-tenants.


314.    All claims submitted to Medicare or Medicaid by Defendants for services referred by any of the physician-tenants to whom Defendants provided illegal remuneration were false claims submitted to the United States.

315.    Defendants submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient

---

[29]    Exhibit A, *Why Health Systems Monetize Mobs,* 2010 Healthcare Real Estate Insights (HREI) Resource Guide, p.16. http://wolfmediausa.com/HREIRG2010/HREIRG2010reduced.pdf.

designated health services rendered to patients who were referred to the hospital by physicians who received improper remuneration which violated the Stark Law, submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by physicians who had improper contracts which violated the Stark Law.

316.    Defendants presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

### A.  Count I:  Federal False Claims Act -- Presentation of False Claims

The allegations in the preceding paragraphs are incorporated by reference.

317.    Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(1)(A), in that they knowingly presented or caused to be presented numerous false claims for payment or approval, to the United States.

318.    Defendants' false claims included claims for designated health services rendered to patients who were referred by physicians with whom Defendants had entered into prohibited financial relationships in violation of the Stark Law.

319.    Defendants' false claims included claims for services to patients unlawfully referred to them by physician to whom Defendants provided illegal remuneration in violation of the Anti-Kickback Statute.

320.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

321.    As a result of Defendants' violations the United States has suffered damages in an amount to be determined at trial.

### B.  Count II:  Federal False Claims Act -- False Statements to Get False Claims Paid

The allegations in the preceding paragraphs are incorporated by reference.

322.    Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) in that they made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by Defendants when initially submitting the false claims for payments and the false certifications made by Defendants in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

323.    Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

324.    The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

325.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

326.    As a result of Defendants' violations the United States has suffered damages in an amount to be determined at trial.

### C. Count III:  Federal False Claims Act -- False Record Material to Obligation to Pay

The allegations in the preceding paragraphs are incorporated by reference.

327.    Defendants violated the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) in that they made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

328.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

329.    As a result of Defendants' violations the United States has suffered damages in an amount to be determined at trial.

### D. Count IV:  Florida False Claims Act

The allegations in the preceding paragraphs are incorporated by reference.

330.     Defendants violated the Florida False Claims Act, F.S.A. § 68.081 *et seq*., in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to an agency in violation of F.S.A. § 68.082(2)(a); and

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by an agency in violation of F.S.A. § 68.082(2)(b).

331.     As a result of Defendants' violations of the Florida False Claims Act, the State of Florida has suffered damages in an amount to be determined at trial.

### E.  Count V: Georgia False Claims Act

The allegations in the preceding paragraphs are incorporated by reference.

332.     Defendants violated the Georgia False Claims Act, O.C.G.A. § 49-4-168 *et seq*., in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the Georgia Medicaid program; and

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program.

333.     As a result of Defendants' violations of the Georgia False Claims Act, the State of Georgia has suffered damages in an amount to be determined at trial.

### F.  Count VI:  Texas False Claims Act

The allegations in the preceding paragraphs are incorporated by reference.

334.     Defendants violated the Texas Medicaid Fraud Prevention Act, Texas Hum. Res. Code, § 36.001 *et seq*., in that they knowingly or intentionally misrepresented or concealed material facts affecting their right to payment under the Medicaid program.

335.     As a result of Defendants' violations of the Texas Medicaid Fraud Prevention Act, the State of Texas has suffered damages in an amount to be determined at trial.

### G.  Count VII:  Tennessee Medicaid False Claims Act

The allegations in the preceding paragraphs are incorporated by reference.

336.     Defendants violated the Tennessee Medicaid False Claims Act, Tenn. Code Ann., § 71-5-181 *et seq*., in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the State; and

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims under the Medicaid program paid or approved by the State.

337.     As a result of Defendants' violations of the Tennessee Medicaid False Claims Act, the State of Tennessee has suffered damages in an amount to be determined at trial.

## H.  Count VIII:  California False Claims Act

The allegations in the preceding paragraphs are incorporated by reference.

338.     Defendants violated the California False Claims Act, California Government Code § 12650 *et seq*., in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the State; and

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State.

339.     As a result of Defendants' violations of the California False Claims Act, the State of California has suffered damages in an amount to be determined at trial.

## VIII.  CONCLUSION

WHEREFORE, Relator, on behalf of himself, the United States, and the States of Florida, Georgia, Texas, Tennessee, and California, prays:

(a)     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and/or the States have sustained because of Defendants' actions, plus a civil penalty as required or allowed by law for each violation of the Federal and State False Claims Acts;

(b)     That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim;

(c)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,


**/s/  *Jonathan Kroner***

Jonathan Kroner
Florida Bar No. 328677
420 Lincoln Rd., Suite. 248
Miami Beach, FL 33139
305.310.6046
JK@FloridaFalseClaim.com
Attorney for Relator

## IX. Exhibits

| | |
|---|---|
| A | Tenet VP Bonrepos - Why Health Systems Monetize MOBs |
| B1 | Benchmark & Tenet Rents, S Fla |
| B2 | Tenet Rents at Time of Sale Above Mkt |
| B3 | Benchmark & Tenet Rents, Houston |
| B4 | Benchmark & Tenet Rents, Atlanta |
| B5 | Benchmark & Tenet Rents, Memphis |
| C | Tenet 2nd Offering Memo, Excerpt |
| D | Tenet 2008 10k Annual Rpt Excerpt |
| E | omitted |
| F | Fl Medicaid Referrals |
| G | OM - Supplemental Information, Excerpt |
| H | OM - Supplemental Information TX, Excerpt |
| I | 2nd Tenet-OfferingMemorandum-NEW |
| J | 2005 - 2007 Palmetto Income |
| K | Joint Appraisal Slack Johnston excerpt |
| L | Rent Roll  777 E 25th Hialeah Fl |
| L1 | 516 - Lopez Lse. 2007, 1st 7 pp only |
| L2 | 516 - Lopez Lse. 2004 |
| L3 | 518 - Radulescu Lse June 07 |
| M1 | Garden Grove Ca Claims and Referrals |
| M2 | Garden Grove sample claims |
| N | omitted |
| O | omitted |
| P1 | SML Texas disclosures Redacted Util for R 4-11-12 |
| P2 | Texas referring physician lis |
| Q | Pagan 2003 lease extract |
| Q1 | Pagan 2007 Renewal |
| R | Tenet CIA excerpt |
| S | Affidavit of Marc Osheroff |

T       Affidavit re BOMA Steve Page

U       BOMA lease excerpts 2002, 2005, 2006

V       FMV Vidal Renewal Letter 4-7-06 RSF

W       omitted

X       BOMA RSF 2004 Ariel Full Lease

Y       BOMA RSF 2003 Pagan

Z       Kickbacks in RSF BOMA leases

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date stamped above I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Jonathan Kroner

**Via CM/ECF only**

Martin B. Goldberg  mgoldberg@lashgoldberg.com

Michael Lee Ehren  mehren@lashgoldberg.com

Katherine A. Lauer  katherine.lauer@lw.com

Jason M. Ohta  jason.ohta@lw.com

Christopher S. Olson  chritsopher.olson@lw.com

Jeremy D. Kernodle  jeremy.kernodle@haynesboone.com

George William Morrison  bill.morrison@haynesboone.com

Nicole Somerville  nicole.somerville@haynesboone.com

Stacy L. Brainin  stacy.brainin@haynesboone.com


Erica Galpern Waxman  erica.waxman@myfloridalegal.com

June C. Acton  june.acton@usdoj.gov,

Renee.Balancier@usdoj.gov


**Via Email**

Mark Coffee  mark.coffee@oag.state.tx.us

Renee Orleans  renee.orleans@usdoj.gov

Steven U. Ross  steven.ross@doj.ca.gov

Mary Elizabeth McCullohs  mary.mccullohs@ag.tn.gov