UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-22253-CIV-HUCK/O'SULLIVAN

UNITED STATES OF AMERICA, *ex rel.*, MARC OSHEROFF,

        Plaintiffs,

v.

TENET HEALTHCARE CORPORATION, *et al.*,

        Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

THIS MATTER comes before the Court on Defendants Tenet Health Corporation, *et al.*'s ("Tenet") Motion to Dismiss Second Amended Complaint ("Mot.") (D.E. No. 124), filed August 27, 2012.  The Court has reviewed the parties' submissions, the relevant legal authorities, and heard oral argument on March 22, 2013.  For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

**I.    BACKGROUND**

This case involves an attempt by Relator Marc Osheroff to hold a medical provider, Tenet, liable for a violation of the False Claims Act.

In his Second Amended Complaint, Relator renews his allegations that Tenet violated the Anti-Kickback Statute and Stark Law and, in turn, the False Claims Act.  Relator's allegations can be summarized as follows.

Tenet, a national healthcare provider, doubled as a landlord to physicians who leased space in a number of Tenet's medical office buildings.  Relator alleges that Tenet leased office space to

1

physicians for an effective rate per square foot that fell below what was consistent with fair market value. Tenet allegedly did this for an economically advantageous, albeit problematic, reason: the same physicians who leased office space referred patients to Tenet. So the less rent Tenet charged the physician-tenants the greater the likelihood, Relator alleges, they would refer Medicare and Medicaid patients to Tenet. Thus, Relator contends Tenet violated two federal statutes: the Anti-Kickback Statute and the Stark Law ("Stark").

Under Stark, a physician and medical provider may not entered into any arrangement involving remuneration — *i.e.*, any sort of payment — if the physician refers Medicare or Medicaid patients to the medical provider. While a lease agreement plainly involves remuneration, Stark defines the term "remuneration" to exclude payments by a lessee to a lessor if, in relevant part, "the rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties," 42 U.S.C. § 1395nn(e)(1)(A)(iv). Thus, Stark doesn't prohibit a medical entity from accepting Medicaid or Medicare referrals from a physician with whom the medical entity has entered into a lease agreement so long as the lease complies with § 1395nn(e)(1)(A)(iv).

The Anti-Kickback Statute prohibits slightly different conduct. *See* 42 U.S.C. § 1320a-7b(b)(2). It makes it illegal for a healthcare provider to knowingly and willfully offer or pay any remuneration to induce a physician to refer an individual for services covered under Medicare or Medicaid. Thus, under the statute, a healthcare provider, like Tenet, may not *knowingly* and *willfully* lease office space for below-market rent to a physician to *induce* the physician to refer Medicaid or Medicare patients back to the medical provider.

Relator alleges that Tenet has violated the Anti-Kickback Statute and Stark. But because neither the Anti-Kickback Statute nor Stark arms Relator with a private right of action, Relator must draw from elsewhere to pin liability on Tenet. For that, Relator looks to the False Claims Act. The False Claims Act aims to "retrieve ill-begotten funds" from individuals who defraud the United States government. *See Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). To further this aim, the Act contains a *qui tam* provision, which permits private persons, *i.e.*, relators, to sue for violations "in the name of the government" and recover a share of the proceeds if the suit is successful. *See* 31 U.S.C. § 3730(b), (d).

Among Tenet's arguments to dismiss Relator's Complaint is that a violation of the Anti-Kickback Statute or Stark does not, by itself, mean that Tenet has knowingly defrauded the government, thus creating liability under the False Claims Act. *See* Mot. 3-4. Rather, to state a claim under the False Claims Act, Relator needed to have alleged that Tenet "knowingly ask[ed] the Government to pay amounts it [did] not owe." *Id.* at 4 (quoting *United States ex rel. Clausen v. Lab Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). And this Relator hasn't alleged, Tenet contends, because nowhere in Relator's Complaint does he assert that Tenet "knowingly submitted a false certification of compliance with" either the Anti-Kickback Statute or Stark. *See Id.* at 3-6. Nor has Relator alleged that such a certification — if one were to exist — was a condition of payment.

Tenet also contends that Relator has not adequately plead violations of the Anti-Kickback Statute and Stark because Relator hasn't adequately alleged a benchmark of fair-market value under which Tenet leased space to its physician-tenants. Therefore, it's not plausible that Tenet and the physician-tenants entered into a prohibited financial arrangement. With respect to the Anti-Kickback Statute, Tenet also contends that Relator has not adequately plead that Tenet

3

induced (or attempted to induce) its physician-tenants to refer Medicaid and Medicare patients back to Tenet. The Court declines Tenet's invitation to dismiss Relator's Complaint on any of these grounds.

## II.     DISCUSSION

### A. Tenet's Alleged Submission of a False Claim

The threshold argument the Court must address is whether Relator has adequately alleged a violation of the False Claims Act. The False Claims Act imposes liability on anyone who "knowingly presents [to the federal government or one of its officers] . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3279(a)(1)(A). Relator alleges that in seeking payment from Medicare, Medicaid, and Tricare in violation of the Anti-Kickback Statute and Stark, Tenet, in turn, violated the False Claims Act because the federal government paid money to Tenet that it otherwise would not have paid had it known of Tenet's statutory violations. Tenet counters that even if Relator adequately alleged violations of the Anti-Kickback Statute and Stark, Tenet isn't liable under the False Claims Act because Relator hasn't adequately alleged that Tenet has made a "knowingly false or fraudulent representation to the government," Mot. 4. To do so, Tenet contends, Relator needed to have alleged that, in seeking payment, Tenet knowingly falsely certified compliance with the Anti-Kickback Statute and Stark when submitting claims for payment. *See id.* And the certification needed to have been "a prerequisite of payment." *Id.*

This argument is not unlike the one Tenet advanced in its previous Motion to Dismiss. *See* Defendants' Motion to Dismiss 1st Am. Compl. 14 (D.E. No. 67), filed April 6, 2012. And indeed, in the Court's July 2012 Order, the Court granted Relator leave to amend his Complaint to include allegations that Tenet certified compliance with both the Anti-Kickback Statute and

4

Stark, and that compliance with both is a condition of the government's disbursement of funds under both Medicare and Medicaid. *See* Order at 12 (D.E. No. 111).

In response to the Court's call for greater specificity, Relator alleges three independent ways Tenet certified compliance with the Anti-Kickback Statute and Stark: (1) two corporate integrity agreements between Tenet and the U.S. government (one in 1994, *see* 2d Am. Compl. ¶ 22, and another in 2011, *see id.* at ¶ 30); (2) Tenet's provider agreement and application for enrollment in the Medicare program; and (3) annual hospital cost reports, *see* 2d Am. Compl. ¶¶ 93-121. The issue for the Court to consider is thus whether one or all of these documents is enough to state a claim that Tenet "knowingly present[ed] [to the federal government or one of its officers] . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3279(a)(1)(A). The Court holds that the representations Tenet made in its Medicare Provider Application and Agreement as well as the hospital cost reports are enough to ground a claim under the False Claims Act.[1]

1. **Medicare Provider Application and Agreement**

Before a healthcare provider can participate in the Medicare program — and receive reimbursement from Medicare — it must complete a Medicare Provider Application and Agreement ("Provider Agreement"). To be eligible for participation in the Medicare program the healthcare provider must certify that it "agree[s] to abide by the Medicare laws, regulations and program instructions that apply to" the healthcare provider. *See* Defendants' Notice Regarding Certifications and Response to the United States' Statement of Interest Regarding the Court's June 20, 2012 Order Ex. 4 (D.E. No. 87-4). The healthcare provider must also certify that it "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with," among other laws, "*the Federal anti-kickback and the*

---

[1] Because the Court concludes that the Medicare Provider Participation Agreement and annual cost reports are enough to ground liability under the False Claims Act, the Court need not address whether the same is true regarding the corporate integrity agreementsTenet entered into with the U.S government.

*Stark law*." *Id.* (emphasis added); 2d Am. Compl. ¶ 100. The question the Court is called upon to answer is thus whether Tenet's understanding and agreement that payment of a claim under Medicare is *conditioned* on the underlying transaction's compliance with the Anti-Kickback Statute and Stark means that Tenet's submission of a claim in violation of either law qualifies as perpetrating a fraud against the government. Fortunately, this question is one on which the Eleventh Circuit has shed some light.

In *United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005), the court maintained that if an entity disqualified from participating in the Medicare program — because, for example, they've violated the Anti-Kickback Statute or Stark — "persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [False Claims] Act, for its submissions of those false claims . . . ." *Id.* at 1259. This is because "the provider knowingly asks the Government to pay amounts it does not owe." *Id.* (citing *United States ex rel. Clausen v. Lab Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)); *cf. United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007) (a criminal defendant commits healthcare fraud when she pays kickbacks after signing Medicare's Provider Agreement, stipulating that "she would follow Medicare's rules and regulations").

Tenet's argument to the contrary, *see* Mot. 4, the Court can find no reason to disregard the Eleventh Circuit's holding in *McNutt*.[2] The language contained in the Provider Agreement makes readily apparent that "the federal Medicare program will not pay claims if the underlying

---

[2] Tenet's contention that *McNutt* has no bearing on this case because there it was "undisputed that the defendants had submitted an express certification that was a condition of payment," Mot. 4 n.3, is misguided. The only difference between this case and *McNutt* is, there, the defendants did not dispute that failure to comply with the Anti-Kickback Statute "disqualified them from receiving payment as part of a Medicare program." *McNutt*, 423 F.3d at 1259. Tenet does not appear to take the contrary position that a provider is eligible to receive payment from Medicare of claims that are in violation of the Anti-Kickback Statute and Stark.

6

transaction that gave rise to the claim violated the Anti-Kickback Statute [or Stark]." *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 393 (1st Cir. 2011) (reversing district court's dismissal of relator's claim for failing to identify a fraudulent claim). Thus, if a healthcare provider requests payment from Medicare notwithstanding the fact that the transactions underlying the claims were in violation of the Anti-Kickback Statute and Stark, the healthcare provider has committed a fraud against the government. And this is precisely the conduct Relator alleges Tenet committed in this case: even though Tenet allegedly knew the transactions underlying the various claims it submitted to the federal government were in violation of the Anti-Kickback Statute and Stark, Tenet nevertheless asked for payment of those claims.

Tenet disagrees that it can be held liable for what amounts to nothing more than "promises to comply with health care laws *in the future*." Mot. 5 (emphasis in original). But this is precisely the argument that the *McNutt* Court, for good reason, rejected. *See McNutt*, 423 F.3d at 1259 (rejecting defendants' argument that "the government seeks to hold them liable for nothing more than falsely certifying on a Medicare enrollment form that they *would* comply with the statute") (emphasis added). The principle underlying liability under the False Claims Act is that the government shouldn't knowingly be asked to pay a sum it wouldn't have paid with full information. Yet, if what Relator alleges is true, Tenet sought (and received) payment from the government for services the government would not have reimbursed had it known of Tenet's alleged violation of the Anti-Kickback Statute and Stark. This is because Tenet's promise to comply with the Anti-Kickback Statute and Stark didn't merely gain Tenet entrance into the Medicare program; its promise was also a "prerequisite[] and the *sine qua non* of federal funding." *United States ex. rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir.

7

2006) (internal quotation marks omitted).  That is, if a violation of Stark or the Anti-Kickback Statute "affected the transaction underlying a claim, as [Relator] alleges, the claim failed to meet a *condition of payment*."  *Hutcheson*, 647 F.3d 394 (emphasis added); *see also Hendow*, 461 F.3d at 1172 (noting that promises to comply with a federal program's participation agreement are conditions of payment "for one basic reason: if the [participant] had not agreed to comply with them, it would not have gotten paid").  If that weren't the case, and Tenet's promise of future compliance was nothing more than just that — a promise that didn't affect Tenet's standing to seek payment from Medicare — healthcare providers like Tenet "would be virtually unfettered in [their] ability to receive funds from the government while flouting the law."  *Hendow*, 461 F.3d at 1176.  This is plainly a practice prohibited by the False Claims Act.

  2.  **Hospital Cost Report**

In order to receive payment from Medicare, Tenet was required to submit an annual cost report to the federal government.  The purpose of a cost report is to provide the government with "comprehensive information on Medicare costs and services provided in the previous year."  *United States ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008) (citation omitted).  With this information, an intermediary of the government "determines whether the government has overpaid or underpaid the provider for the year."  *Id.* at 1218 (citation omitted).  The cost report provides, in relevant part, that "if services identified in this report [were] provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."  *See* Defendants' Notice Regarding Certifications and Response to the United States' Statement of Interest Regarding the Court's June 20, 2012 Order Ex. 1 (D.E. No. 87-1). The signatory of the cost report also certifies that he or she is "familiar with the laws and

regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." *Id.*

Relator alleges that because payment for services under Medicare is conditioned on the submission of accurate cost reports, the government paid for services it otherwise would not have paid had it known of Tenet's failure to comply with "laws and regulations regarding the provisions of health care services" — *i.e.*, the Anti-Kickback Statute and Stark. Tenet, on the other hand, contends that the hospital cost reports are too generally worded to trigger liability under the False Claims Act. Thus, Tenet's alleged certification that it complied with all applicable healthcare laws and regulations does not, in turn, mean that it has certified compliance with any *particular* law or regulation. If this were the meaning of its certification, Tenet warns, "all providers submitting cost report certifications would find themselves subject to [False Claims Act] liability merely upon a showing that the providers violated a single law or regulation 'regarding the provision of health care services.'" Mot. 6 (citing *Conner*, 543 F.3d at 1221).

The problem with Tenet's argument is that it misapprehends the standard to find liability under the False Claims Act. To adequately allege a claim under the False Claims Act, Relator must allege that Tenet misrepresented a material fact. A material fact is one that that was "capable of influencing Medicare's decision to pay the claims," *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 394 (1st Cir. 2011) (citation omitted). If Relator's allegations that Tenet violated the Anti-Kickback Statute and Stark are true, Tenet's representations to the contrary in its hospital cost report can easily qualify as a misrepresentation of material fact.

The cost reports make clear that Tenet made misrepresentations of fact; namely, that the services identified in the cost reports were provided in compliance with the Anti-Kickback

9

Statute and Stark. The fact that the cost reports did not thereafter specifically name either law does not alter the Court's analysis.³ Tenet's representative's certification that it was "familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations" was "more than specific enough to make clear that . . . [Tenet] represented that any underlying transactions had not involved third party kickbacks prohibited by the [Anti-Kickback Statute]" or Stark. *Hutcheson*, 647 F.3d at 393; *see also United States ex rel. Daugherty v. Bostwick Laboratories*, No. 1:08v-0035, 2012 WL 6593804, at *5 (S.D. Ohio Dec. 18, 2012) ("A false certification of compliance with the Anti–Kickback Statute and Stark Statute in a Medicare cost report is actionable under the [False Claims Act].") (citation omitted).

Whether this alleged misrepresentation was material — *i.e.*, capable of influencing Medicare's decision to pay the claim — is a separate issue. On this limited record, the Court cannot say, as a matter of law, that the alleged misrepresentation was "*not* capable of influencing Medicare's decision to pay the claims" listed in the cost reports. *Id.* at 394 (emphasis added) (citation omitted); *see also United ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902-903 (5th Cir. 1997) (We are unable to determine from the record before us whether, or to what extent, payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compliance. We therefore deny defendants' 12(b)(6) motions as they relate to this issue and remand to the district court for further factual development."). In light of the standard the Court must employ when reviewing a motion to dismiss — that all reasonable inferences are drawn in the plaintiff's favor — the Court may

---

³ The Court again notes that a cost report specifically advises the healthcare provider that "if services identified in this report [were] provided or procured through the payment *directly or indirectly of a kickback or where otherwise illegal*, criminal, civil and administrative action, fines and/or imprisonment may result." (emphasis added).

10

reasonably infer that the alleged misrepresentations Tenet made in its cost reports *were* capable of influencing Medicare's payment decisions.

Tenet's argument about the allegedly dire implications of a holding that a misrepresentation located in a hospital cost report *can* ground a claim under the False Claims Act is wide of the mark. First, "the rule advanced by [Tenet] that only express statements in statutes and regulations can establish preconditions of payment is not set forth in the text of the [False Claims Act]." *Hutcheson*, 647 F.3d at 388. Second, Tenet's concerns of an avalanche of False Claims Liability are largely illusory because "other means exist to cabin the breadth of the phrase 'false or fraudulent' as used in the [False Claims Act]." *Id.* That is, liability cannot arise under the False Claims Act "unless a defendant acted knowingly and the claim's defect is material." *Id.*

For all these reasons, the Court finds that the Provider Agreement and the cost reports Tenet submitted to the federal government can each form the basis for liability under the False Claims Act.[4]

### B. Sufficiency of Relator's Allegation that Tenet Violated the Anti-Kickback Statute and Stark

#### 1. Relator has Adequately Plead a Benchmark of Fair Market Value

Under both the Anti-Kickback Statute and Stark, a medical provider cannot enter into a relationship with a referring physician that involves remuneration — *i.e.*, "any payment or other benefit." Both statutes also prohibit, more specifically, medical providers from entering into lease agreements with referring physicians for an amount that is below fair market value.

In his Second Amended Complaint, Relator accuses Tenet of doing the latter — leasing

---

[4] Relator alleges that both Medicaid and TRICARE reimbursements are based on representations made in Tenet's Medicare cost reports. *See* 2d Am. Compl. ¶¶ 116, 121. Because the Court finds that the cost reports submitted to Medicare can form the basis for liability under the False Claims Act, the Court arrives at the same conclusion regarding the cost reports submitted to Medicaid and Tricare, in light of the fact that both Medicaid and Tricare rely on the representations made in the Medicare cost report. *See* 2d Am. Compl. ¶¶ 114, 120.

space to referring physicians on impermissibly favorable terms.  First, Relator alleges that Tenet systematically underrepresented the size of the office space it leased to its physician tenants, in turn giving the physician-tenant "free" office space.  *See* 2d Am. Compl. ¶ 154.[5]  This resulted in an effective rate per square foot that was less than the contractual rate per square foot — which Tenet allegedly represented was *consistent* with fair market value.  *See id.* at ¶¶ 154, 179.  Thus, Relator contends, if the *effective* rate per square foot fell below the contractual rate, it also fell below what qualifies as fair market value.  *See id.* at ¶ 185.  Second, Relator separately alleges that even the contractual rate fell below the fair market rate.  *See id.* at ¶ 223.  Third, Relator highlights a number of allegedly non-standard benefits — which only referring physicians received — that further lowered the effective rate per square foot.  These benefits included: (1) excessive tenant improvement allowances, *see id.* at ¶¶ 247-272; (2) Tenet's failure to charge referring physicians the full "cost-of-living" increase (a common feature in commercial leases), *see id.* at ¶ 283; (3) medical waste "red bag" collection service, *see id.* at ¶ 275; (4) sharps collection service, *see id*; (5) electrical and other utilities, *see id*; (6) parking, *see id.*; (7) janitorial service, *see id.*; and (8) paper goods that are more expensive than regular office paper goods, *see id.* at ¶ 277.  The Court concludes that Relator's detailed allegations regarding the favorable lease terms provided to referring physicians are sufficient to allege a violation of both the Anti-Kickback Statute and Stark, and in turn a claim under the False Claims Act.

Generally, a complaint need only state "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a).  This general rule is not applicable here, however, because Relator alleges a cause of action under the False Claims Act, and thus must

---

[5] Relator points to its allegation that Tenet consistently understated the amount of office space in its lease agreements with its physician-tenants as having been a major selling point when Tenet attempted to sell its medical office buildings.  Tenet advertised that "when leases expire, any renewals or new leases can be based on the actual re-measured square footage rather than the amount stated in the current lease documents." 2d Am. Compl. ¶ 156.

satisfy FED. R. CIV. 9 (b).  Under Rule 9(b)'s heightened pleading standard, Relator must plead the "circumstances constituting fraud . . . with particularity." *See United States ex rel. Clausen v. Lab Corp. of America, Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002).  Tenet contends that Relator has failed to satisfy Rule 9(b)'s particularity requirement because Relator has not followed the Court's directive that he must "allege a benchmark of fair market value against which [Tenet's] rents to physician-tenants can be tested."  Order at 14.

The Court disagrees.  Relator's Second Amended Complaint highlights a number of particular facts from which one may reasonably infer that Tenet enter into below-market-rate leases with referring physicians, in violation of the Anti-Kickback Statute and Stark.  Relator also provides a number of specific examples where Tenet charged referring physicians below-market-rate rent — via systematically misrepresenting the square footage of the office space it leased to referring physicians, thus reducing the price per square foot the physician-tenants paid to an amount below fair market value, *see* 2d Am. Compl. ¶¶ 154, 179, 182 — or provided them with non-standard lease benefits.  Among the facts Relator relies on to support his allegation that Tenet offered referring physicians below-market-rate rent is a 2007 appraisal, commission jointly by Relator and Tenet, indicating that the fair market value for two medical office suites located "a short walk" away from Tenet's medical office building in Hialeah, Florida, was well above the price per square foot Tenet charged its physician-tenants in the Hialeah building, *see* 2d Am. Compl. ¶¶ 202-212; Ex. K.  Relator also relies on an empirical analysis he undertook, which indicates that in various markets around the United States, Tenet charged its physician-tenants far less than the *average* price found in the market, *see* 2d Am. Compl. ¶¶ 213-229; Ex. B-1.

Relator also cites to numerous specific lease agreements with referring physicians where the effective rate per square foot fell well below market rate or other concessions were given.  *See*

13

*e.g.*, 2d Am. Compl. ¶¶ 176-179 (analyzing referring physician's lease where Tenet understated the actual square footage of the leased office space, resulting in referring physician receiving below-market-rate rent at Palmetto Medical Plaza, in addition to numerous other benefits that Tenet provided); 2d. Am. Compl. ¶¶ 180-185; 2d Am. Compl. Ex. B-2 (analyzing a referring physician's lease where Tenet charged a price per square foot ($20.30) that was significantly below the rate actually paid by Tenet ($36) to another lessor for comparable office space); 2d Am. Compl. ¶ 256 (alleging that a referring healthcare provider at Palmetto Medical Plaza received a tenant improvement allowance equal to 40% of the total rent due over the lease's three-year term).

Tenet contends that none of these figures represent a benchmark of fair market value because, for instance, Relator "does not rely on data from buildings of similar quality and location, but instead uses data from buildings scattered nationwide, without rhyme or reason." Mot. 9.  It may very well be the case that Tenet's attack on Relator's methodology of arriving at a benchmark of fair market value is entirely appropriate.  But at this stage in the litigation, it is not the Court's role to weigh the merits of Relator's and Tenet's respective positions.  Under the Court's very circumscribed review, the Court's role is only to determine whether Relator plausibly alleges that Tenet was charging its physician-tenants rent that was inconsistent with fair market value — not to determine definitively whether the figure Relator advances, in fact, represents fair market value.[6]

---

[6] The cases Tenet cites in support of dismissing Relator's Complaint for failing to plead a benchmark of fair market value, *see, e.g.*, *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045 (N.D. Ill. 2002); *United States ex rel. Woods* v. *N. Ark. Reg'l Med. Ctr.*, No. 03-3086, 2006 WL 2583662 (W.D. Ark. Sept. 7, 2006), are distinguishable.  In *Obert-Hong*, the relator provided the court with nothing more than "bald allegations" that defendant health care provider acquired a group of medical practices for a "commercially unreasonable" amount to induce the selling physicians to refer patients to the medical provider.  The same was true of the complaint filed in *United States ex rel. Woods* v. *N. Ark. Reg'l Med. Ctr.*, 2006 WL 2583662.  The Court's review of the complaint in *Woods* demonstrates that the relator there failed entirely to identify a benchmark of fair market value in alleging a violation of the Anti-Kickback Statute and Stark.  *See* Substituted First Amended Complaint, *United States ex rel.*

### 2. Relator has Adequately Plead Inducement Under the Anti-Kickback Statute

Unlike Stark, the Anti-Kickback Statute contains a scienter requirement. It prohibits a medical provider from knowingly or willfully offering or paying a physician remuneration to induce referrals for any services under Medicaid or Medicare. *See* 42 U.S.C. § 1320a-7b(b)(2). Tenet contends that Relator has not adequately plead that any of Tenet's physician-tenants referred Medicaid or Medicare patients to Tenet *because of* the below-fair-market-value leases. Nor has Relator adequately alleged that Tenet entered into these leases for the purpose of inducing referrals. Mot. 12.

Contrary to Tenet's contention, Relator need not allege that Tenet's physician-tenants referred Medicaid or Medicare patients to Tenet *on account of* Tenet's offer or payment of remuneration — here, a below-market-rate lease. Instead, to satisfy his pleading burden under the Anti-Kickback Statute, Relator need only allege that Tenet knowingly offered a below-market lease to *induce* a referral for services under Medicaid or Medicare. And this Relator has done.

In the Court's view, Relator satisfied his pleading burden merely by alleging that Tenet was motivated to enter into below-market-rate leases at least *in part* to induce the physicians to refer patients to Tenet. *See* ¶ 129; *cf. United States v. McClatchey,* 217 F.3d 823, 835 (10th Cir.2000) ("[A] person who offers or pays remuneration to another person violates the Medicare Antikickback Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals."). This is because the Court can reasonably infer that a landlord would not enter into a lease agreement for a price that fell below the fair market rate if some

---

*Woods* v. *N. Ark. Reg'l Med. Ctr.*, No. 03-3086 (D.E. No. 38), filed October 14,2005. Furthermore, the court's dismissal of relator's complaint for "failure to identify the fair market value of the goods and services provided was but one of a laundry list of deficiencies contributing to its dismissal," *United States ex rel. McDonough v. Symphony Diagnostic Services, Inc.*, No. 2:08-CV-00114, 2012 WL 628515, *6 (S.D. Ohio Feb. 27, 2012) (citing *Woods*, 2006 WL 2583662, at *3).

other consideration were not involved. Here, that other consideration would be, as Relator alleges, patient referrals.

This is not all. Relator's Complaint highlights a host of particular facts from which one may reasonably infer that Tenet offered below-market-rate leases to induce referrals. For example, Relator alleges that Tenet required non-referring physicians to pay a higher rate per square foot than non-referring physicians, *see* 2d Am. Compl. ¶¶ 230-242. Relator also alleges that although nearly all the leases Tenet entered into understated the size of the office space, the small number of leases that overstated the size of the office space were, almost without exception, leased to *non*-referring tenants. *See id.* at ¶¶ 243-246. The fair implication of this, Relator suggests, is that where the tenant could not offer a benefit to Tenet in the form of patient referrals, Tenet saw no need to offer the tenant below-market-rate rent. From these facts, one may reasonably infer that Tenet offered its physician-tenants below-market-rate rent to induce patient referrals.

**C. Relator's Reverse False Claim**

In Count III, Relator alleges that Tenet "made and used or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States." 2d Am. Compl. ¶ 54 (citing 31 U.S.C. § 3729(a)(1)(B)).[7] Relator's allegation of a so-called "reverse false claim," *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012), is problematic in several respects.

First, Relator cites the incorrect statutory provision from which he quotes. The statutory provision that refers to a reverse false claim is 31 U.S.C. § 3729(a)(1)(G), not 31 U.S.C. § 3729(a)(1)(B). Second, as Tenet correctly notes, Mot. 17-18, Relator has failed entirely to allege that Tenet perpetrated a fraud against the government "for the purpose to conceal, avoid, or

---

[7] Relator includes Count III for the first time in his Second Amended Complaint.

decrease an obligation to pay money to the government." *Matheny*, 671 F.3d at 1222 (emphasis added); *see also id.* ("To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) *for the purpose to conceal, avoid, or decrease an obligation to pay money to the government*; and (5) the materiality of the misrepresentation.") (emphasis added).  To allege this element of a reverse false claim, Relator must identify — but, as indicated above, has not — particular facts from which one may reasonably infer that Tenet "owed an obligation to pay money to the United States," and made a fraudulent statement to avoid or decrease this obligation.  *See id.* at 1223.[8]  The Court grants Relator's request, *see* Resp. 17, for leave to amend his Complaint to address this pleading deficiency.

### III. CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Defendants' Motion to Dismiss Second Amended Complaint and Memorandum of Law in Support is GRANTED only as to Count III and DENIED in all other respects.  Relator has until April 11, 2013 to amend Count III.

DONE AND ORDERED in Chambers, Miami, Florida, March 27, 2013.

                              Paul C. Huck
                              United States District Judge

Copies furnished to:
All counsel of record

---

[8] Relator apparently agreed, as suggested by his legal argument, which offers little in opposition to Tenet's Motion to Dismiss Count III.  It is thus unsurprising that he asks, in the alternative, for leave to amend Count III.  *See* Resp. 17.